NEILL and another *v.* THE FRANCIS, etc.

*(District Court, S. D. New York. September 20, 1884.)*

1. MARITIME LIEN—SUPPLIES—FOREIGN PORT—CHARTERER.

Where the charterer of the steamer F. for the "centennial season," not being master, applied in person to coal dealers in Philadelphia for coal, upon her first trip thither from Bridgeport, Connecticut, stating that he had a charter for the season, and directed the coal to be billed to him, and gave in payment his check on a Bridgeport bank, stating that it was not then good, but he thought it would be when presented, and no reference was made to the vessel as a source of credit, and there was no inquiry made of the master or dealing with him, or with any other officer or agent of the ship, and the charterer had, by the terms of the charter-party, agreed to pay for all such supplies, *held,* that the circumstances indicated to the libelants that the application for coal was upon the charterer's credit only, and that, in furnishing the coal thereupon without any dissent or reference to the credit of the ship, or inquiry of the master, the libelants must be held to have acquiesced in trusting to the charterer only, and that the ship was not bound.

2. SAME—PERSONAL CREDIT.

In dealing with a known charterer in a foreign port for mere ordinary supplies, the dealings are *prima facie* upon his personal credit only. *Semble,* no sound legal or commercial reason exists why such dealings, not being a case of actual necessity or distress, should not be held subject to the precise limitations in the charter of which the material-man has, or is affected with, knowledge.

In Admiralty.

*Huntley & Bower,* for libelants.

*William P. Dixon,* for claimants.

BROWN, J. This libel was filed to recover $292.50, the price of 65 tons of coal supplied to the steamer Francis at Philadelphia on May 17, 1876. The general owners, the Providence & Stonington Steamship Company of Rhode Island, appear as claimants of the steamer, and deny that any lien was acquired upon the vessel.

The proof shows that in the spring of 1876 the claimants chartered the steamer to one H. M. Hoyt, of Bridgeport, Connecticut, to run as an excursion steamer between Bridgeport and Philadelphia during the centennial season; that the captain of the steamer was designated by the claimants, but that he was to be in the employ and pay of the charterer, who had exclusive possession, control, and management of the steamer during the term for which she was hired; that the charter contained a further clause providing that the charterer should "provide and pay for all the coal, fuel, pilotages, and all other charges whatsoever;" that Hoyt took possession of the steamer under the charter, accompanied her to Philadelphia, and applied to one Ziegler for coal, informing him of the charter; that Ziegler, being a retail dealer only, was unable to obtain the drawback allowed to wholesale dealers, and thereupon introduced Hoyt to the libelants, who were wholesale dealers, and who, by shipping coal on board under a bill of lading, could procure and allow to Hoyt a certain drawback upon the price; that Hoyt told the libelants, when making arrangement for the coal, that he had chartered the Francis to run between Bridgeport and Philadelphia during the centennial season, and wanted coal for her; that at the same time he told the libelants "to make out the bills to him," which was done, and that he gave to the libelants his check for the amount, drawn upon a bank at Bridgeport, telling them that the check was not then good, but that he thought it would be good by the time it was presented. Nothing was said between Hoyt and the libelants as to any credit of the ship. Hoyt received from the libelants an order on the Reading Railroad Company for delivery of coal at Richmond, some two or three miles up the river, and the steamer went there and took it aboard, giving a bill of lading therefor, upon which the usual drawback was allowed.

There is no evidence in regard to the credit of Hoyt in Philadelphia. He was not before known to the libelants. The coal does not appear to have been charged to the ship, but was billed to Hoyt only, in accordance with his directions. One of the libelants, however, testified that they would not have sold, on the credit of Hoyt only, if they had not supposed they had a lien on the vessel. It is not testified that anything was said by either about any credit of the vessel, but it is clear that the coal was directed by Hoyt to be billed to him. Neither the captain nor any other officer of the ship took any part in the purchase of the coal. The captain testified that he notified Ziegler, who came aboard the vessel, that the steamer was not to be liable for any supplies; Ziegler, however, denies this. It is probable that the captain's notice was to some other person. The

check, on presentment, was protested for non-payment, and this libel was subsequently filed in September following.

The above facts present a case in most respects similar to that of *Stephenson* v. *The Francis*, 21 FED. REP. 715, in which I have recently held that no lien was acquired. The bill of lading, in this case, was a mere form adopted to procure the drawback, and has no bearing on the question of lien. In the present case there is not, it is true, the same evidence as in the former, that the captain expressly stated to the libelants that the ship would not be bound; but the libelants were fully informed that Hoyt was the charterer for the centennial season, and having that knowledge they must have understood, as business men, that he was bound to provide and pay for the coal; and that in applying for the coal in person, and in directing it to be billed to him, he was acting in conformity with his obligations to the general owners, and did not intend that the ship should be held; and in supplying the coal without any dissent from Hoyt's proposition, or intimating any claim upon the ship, they must be understood as acquiescing in his proposition, which was, in effect, to furnish the coal on his personal credit only, in conformity with his obligation to the general owner. To my mind, these circumstances, with the giving of the check in payment, and the absence of all reference to the ship as a source of credit, negative any idea that the ship was intended to stand as security, or to be bound for the debt. There is nothing unusual or improbable in such a personal trust for a small bill for so brief a period in the beginning of a season's business. It is the habit of business men, in all branches of trade, to take small risks in this way at the beginning of a season's trade.

I have no doubt that the captain, as he testifies, did notify some one who came on board in reference to the coal that the ship would not be bound. He was nominated by the claimants to look after their interests; and it was his duty to give such notices to persons furnishing ordinary supplies to the steamer. The only reason why the libelants were not so notified expressly, was that they did not deal with the ship or her captain, but with the charterer away from the ship. This furnishes an additional reason why, in the absence of all reference to the ship as a source of credit, the libelants should be held *prima facie* to be dealing with the special owner on his own responsibility only, as I have previously held. The knowledge, moreover, that he had chartered the ship for the centennial season, and was himself applying for coal upon his own check, if not of itself sufficient to indicate that he was bound to provide and pay for it, and that he intended to do so without charging the ship, was at least sufficient to put them upon inquiry as to the terms of the charter, and therefore to affect them with knowledge of it; and this knowledge, coupled with the charterer's application for the coal and proposed payment by his own check, must have shown them that no credit of the ship was intended, but the contrary. The libelants could not

reasonably have imagined that the steamer, during this "centennial season," was to be run by the charterer at the ship's expense. The notice to them of the charter, and the charterer's form of application for coal, still further strengthened this natural presumption. Had they designed to secure the credit of the ship, it was their duty, under these circumstances, either to state this to Hoyt, seeing he was clearly proposing his own credit only, or (as in my judgment they ought legally to be held bound to do) to inquire of the captain of the ship, as the person representing the interests of all. In dealing, not with the master, who in a foreign port represents by the marine law the interests of all parties, and presumptively knows the needs of the ship, and its limitations, but with a known charterer only, not being an officer of the ship, and for mere ordinary supplies, there is no sound legal or commercial reason why such dealings, not being a case of actual necessity or distress, should not be held subject to the precise limitations of the charterer's powers as specified by the charter, of which the material-man has, or is affected with, knowledge. All that the captain could do for the protection of the ship was to notify those who dealt with the ship herself through him, or her officers, that she was not to be bound for supplies; and this it must be inferred from his testimony that he did.

In the case previously referred to I held that an owner, though in a foreign port, not being master, in obtaining supplies on his own personal order, without any reference to the ship as a source of credit, does so, *prima facie*, on his own personal credit; that in order to hold the ship the material-man must show either an agreement or some circumstances indicating a common intention to bind the ship. In the present case, not only is no such intention shown, but the circumstances, to my mind, clearly indicate the contrary.

The libel must therefore be dismissed; but, under the circumstances, without costs.