## The Tregurno.

### Russell et al. v. The Tregurno.

#### (District Court, S. D. Florida. January, 1892.)

SALVAGE—COMPENSATION.

The steamer T., bound from Galveston to Liverpool, went aground on the Florida coast about 25 miles north of Cape Florida, December 5th, and was without assistance until the morning of the 8th, when two small vessels reached her. They at once got an anchor and heavy chain into deep water, but before they could make fast night came on, with a heavy storm, during which the T. was driven fast upon the rocky bottom. Other vessels arrived until the 10th, when there were 15 vessels, of 489 tons, and 200 men; also the wrecking schooner Cora, from Key West, with steam pumps and other appliances. The whole force was engaged 25 days in taking out the cargo of cotton and carrying it to Key West, 158 miles, a revenue cutter assisting therein by towing some of the vessels two trips. They thus saved 3,105 bales, the largest part dry. There was no anchorage nearer than 25 miles, and several times the salving vessels were driven there by bad weather. Two of them were damaged while taking off cargo in the heavy seas. Finally a wrecking vessel arrived from New York, and, though her services were not absolutely necessary, they were accepted, and the T. was got off and taken to Key West. She was appraised at $90,000, and her cargo at $115,000. *Held,* that 25 per cent. would be proper compensation for the whole service, but in view of the aid rendered by the revenue cutter and by the New York vessel, for which the latter was compensated by the claimants, there should be allowed but 22½ per cent.

In Admiralty. Libel by A. Russell and others against the British steamship Tregurno and cargo to recover for salvage services. Decree for libelants.

*L. W. Bethel*, for libelants.
*Jeff. B. Browne*, for claimants.

LOCKE, District Judge. This vessel from Galveston, bound for Liverpool, went ashore on the Florida coast, about 25 miles to the northward of Cape Florida, on the night of the 5th of December last. She had been ashore on the Bahama banks, and thrown overboard about 2,000 bales of cotton, a lot of copper, and lost her small anchors and hawsers in getting afloat, and was leaking some when she went ashore. She was at a distance from any assistance, and received no aid until two of the smaller vessels reached her on the morning of the 8th. They had with them but 14 men, and went to work as soon as their assistance was accepted, getting out an anchor and heavy chain into deep water; but, before they were able to get it to the ship and make it fast, night came on, and the weather and sea became so bad they were obliged to buoy the end and leave it. That night the wind and sea were very heavy. The crew of the steamer did not consider it safe to remain on board, but went ashore onto the beach. During the night the salvors could do nothing but remain on board. The steamer swung around onto the beach, and beat into and upon the hard rocky beach until, in the morning, but 8 feet of water was under her stern, 10 amidships, and 12 forward, and she had sprung a leak, so that there was about as much water inside her as outside, with 6½ feet of water on the engine room. The weather continued bad, so that nothing could be done towards connecting the chain with the vessel or lightening the vessel of cargo, but the salvors went to work breaking out cotton, and hoisting it upon the deck, so as to be ready for discharging as soon as vessels could come for it. On the 9th three more wrecking schooners arrived, and on the morning of the 10th others, so that there were an aggregate of 15 vessels, of 489 tons and nearly 200 men. The weather continued bad until the morning of the 10th, when they carried out a wire cable, connected it with the chain, and brought it to the windlass. In the mean time the wrecking schooner Cora had arrived with steam pumps, boilers, and other steam appliances. The steamer had no appliances by which manual labor could be made available, no windlass breaks or capstan bars, and it was only when steam power could be used that anything could be done towards heaving any strains on the anchor. The engine room and engines of the steamship were under water, and the only appliances that could be made available were those of the Cora. The salvors continued discharging cargo and pumping with their steam pumps. They had to bring the cotton to Key West, a distance of 158 miles. They got out what they could of the cargo dry, but much of it was wet. They took out in all 3,105 bales of cotton, of which 2,266 were dry, and the rest from under water. The weather was bad much of the time during the service, and for several days it was impossible to come to the vessel for cargo. There was no anchorage or protection for the salvors' vessels nearer than Cape Florida, nearly 25 miles distant, where they had to take refuge several times. The water deepened rapidly from the beach

where the steamer was lying, and she was exposed to the full sweep and force of the sea. In order to facilitate the discharging of the vessel, the salvors landed about a, thousand bales of cotton at Cape Florida, and after the vessel had been got afloat, and brought to Key West, that was also brought and delivered to the master here. The salvors were engaged for 25 days in the service, every day of which they were at work. They say that all nights except two they worked until 12 o'clock at night, and those two nights until 10 o'clock. 1,631 bales were hoisted by hand; the rest were hoisted by the steam of their boilers. They carried out another anchor, and continued to keep their pumps going until the water was below the ship's engines. After the libelants had been at work 13 days, the wrecking steamer J. D. Jones, sent out by those interested in the property, arrived from New York, and offered her services. The vessel had been about pumped out, and moved from her bed, and would without doubt have come off the next tide, but the libelants deemed it safe to accept all the assistance offered, so permitted the J. D. Jones to lay out another heavy anchor, and take a line from the steamship. They also put a large steam pump from her on board the Tregurno, to be ready in event of an unexpected leak. They finally floated the Tregurno, and brought her to Key West. Upon an examination she was found not to have been materially damaged, although her bottom was somewhat dented. Many rivets were broken out, and the seams were leaking in places. The property has been appraised by appraisers appointed by the court,—the vessel at $90,000, and the cargo at $115,446.

This was unquestionably a salvage service of considerable merit. The property was in a condition of peril; the vessel liable at any severe weather to be so broken and injured as to be worthless; and the cargo, even if saved from going adrift, to be so scattered along the beach as to be considered but little less than a total loss. The master was utterly powerless to relieve or assist the property in his charge, and there was no aid that could be procured, except the salvors, nearer than Norfolk or New York. The property of the salvors was exposed to dangers very much greater than of ordinary commerce and navigation. Two of their vessels, while alongside endeavoring to take cargo, were damaged by the heavy sea and bales of heavy wet cotton. The labor was severe, unremitting, and long continued.

The salvors were, with a few exceptions, regular licensed wrecking vessels of this district, whose duty it is at any time to go to the assistance of property in distress, and are dependent in a great degree upon earnings from such services. They have rendered valuable aid to the property, and are entitled to a liberal compensation. In defense of the salvage claim, or in mitigation of it, it has been urged that the first set of salvors—those who first arrived—were remiss in their duty in not laying out a heavy anchor, and making the ship fast by heavy strains, to prevent her driving further ashore that night, which necessitated so much subsequent labor and damage. The salvors are bound to do, in the line of salvage service, all their powers and the means within their control can possibly enable them to do, and whenever, from lack of en-

ergy, activity, or effort, they leave undone anything which they might have done, it will be considered in diminution of salvage; but in this case I am fully satisfied that it was not within the power of the few salvors there the first day to have connected the heavy anchor and chain which they carried out with the vessel before the weather became so bad that it was impossible. The master does not show by his testimony that it could have been done, and the statements of the salvors, and the entire circumstances at the time, satisfy me. I am also satisfied that after the first night the vessel was not driven any further ashore or aground on account of any discharging of cargo, and that there was neither loss of time nor damage to property on account of not carrying out a hawser, making fast to the cable, and heaving chains before it was done. I am therefore convinced that the salvors did as well as the means at their control would permit, and there can be no reduction from the merits of what they really did do for their inability to accomplish more.

It is also urged that several of the salving vessels while engaged in this service, and while on their way to or from Key West with cargo from this vessel, rendered aid to the steamships Erl King and Manin, which were ashore at the same time. This appears from the evidence to be true to a certain extent. It does not appear how many of such vessels rendered such service, or how long they were engaged, nor does it appear that such number was sufficiently great to interfere with or delay the work in this case. If, at most, it prolonged the service a day or two, there was no damage to the property, nor injury to the interests in this case. Unless those other vessels, when found in distress, had ample assistance, it was the duty of the vessels engaged in this service to render them all the aid within their power, and, unless it is shown that they neglected property in this case to its injury, there is no reason that it should diminish their compensation.

The services of the revenue cutter McLain were secured for two trips in assisting in towing some of the schooners to and from the steamship. Although no amount can be allowed for this vessel, she being the property of the government, the expense of coal and other supplies must be paid, and her officers and crew are entitled to a compensation, although at a much less rate than the regular salvors. The wrecking steamer J. D. Jones was employed by those interested in the property, and will be compensated by them, and her services are not to be paid for from any salvage given in this case. In determining the amount that may reasonably be allowed for this service, there are a few peculiar circumstances which influence the decision. Numerous cases have been referred to by counsel in the case, both from this district and from the district of Virginia. We find comparatively few cases in this district where the circumstances resemble those of this. The character of the bottom and the exposure to the sea from deep water usually requires immediate aid, and wherever the vessel has been saved it has been by an immediate lightening of cargo and floating by means of anchors. Seldom has one so far aground and so filled with water been rescued. In

most of those cases the property was in greater danger from immediate damage than this, but saved with much less labor and less time; and, although the rate per cent. given has, where both vessel and cargo have been saved, been much less than I consider may be fairly given in this case, the amounts of the individual shares have been much greater, when the time occupied is taken into consideration.

The cases of *The Kimberley*, reported in 40 Fed. Rep. 290, cited by the claimants, and of *The Sandringham*, 10 Fed. Rep. 562, and *The Egypt*, 17 Fed. Rep. 359, resemble this case more in the peculiar circumstances than the general class of cases in this district. Those cases, all decided in the eastern district of Virginia, were for the salvage of iron steamships and their cargoes upon an uninhabited coast, at some distance from assistance, where the cargo had to be discharged, the water pumped out, and the vessel hauled off by anchors. Each of those vessels lay upon a sandy bottom; this one, on a rocky one. In *The Kimberley* the cargo had to be transported 60 miles to port, in *The Sandringham* 30 miles, and in *The Egypt* about 40 miles; in this case, it was 158 miles. In those cases assistance was within those distances; but in this, very nearly all of the aid came from Key West, 158 miles. In those cases the shoals outside and around the vessels necessitated taking off the cargoes, or much of them, in the surf boats, but at the same time prevented the full force of the sea from reaching the vessels, as it did in this case. Here the full force of the sea reached the vessel ashore, on account of the nearer approach of deep water, and, there being no anchorage, rendered the position of the salvors' vessels one of greater peril. Here, as in *The Sandringham*, the steamship's crew left at the first appearance of rough weather, and the master, having no idea his vessel would be saved, sent them to Key West to be forwarded to England.

It is a question whether in this case the time occupied and labor performed in taking the cargo the greater distance to port, does not fully equal that attending the boating of the cargoes off in those cases. In the case of *The Sandringham*, where the salvors were engaged about a week and took out 1,049 bales of cotton, the court gave one fourth of the value, which was $193,000. In *The Egypt* the salvors were engaged 8 days, discharged between 1,100 and 1,200 bales of cotton, and the court gave one fifth upon an agreed estimation of $250,000, in addition to $4,256.55, which amount had been expended by the wreckers. In *The Kimberley*, where the labor was more protracted and severe, the court gave an award of 20 per cent. upon a value of $490,000 as a bonus or gratuity, in addition to an amount expended and *per diem* compensation for the vessels and appliances of the salvors, amounting to $46,000, or a total salvage compensation of $144,000, or about 29 per cent. upon the total valuation. An appeal having been taken, the case was compromised for a compensation of $100,000. In the case of *The City of Worcester*, 42 Fed. Rep. 913, where the vessel was on the rocks near the entrance to New London harbor, and valuable services were rendered by patching and repairing holes in the bottom, getting her afloat, and taking her to New York, $31,753.52 was given on a valuation of $237,500.

In this case the property has been appraised, by a board of appraisers appointed by the court, at $205,496, such appraisement objected to, and such objection fully heard by evidence and argument, and, although some doubts have been thrown upon the absolute correctness of the appraisement, nothing has been offered showing that a more satisfactory valuation could be arrived at without handling, sampling, and classifying each bale of cotton. This is deemed an unnecessary expense, and, while the valuation may be too high, it is possible that it is too low, and the report of valuation will be accepted as sufficiently near the true value to justify the determination of salvage.

Had there been no aid or service rendered but what was represented and entitled to salvage under the libel, I should not consider 25 per cent. of the net value of the property saved as unreasonably large, and should make that award; but the value of service of the revenue cutter McLain, as well as of those of the wrecking steamer the J. D. Jones, must accrue to the benefit of the property, and not of the wreckers, and must reduce the amount of the salvage to that extent; and it is considered that 22½ per cent. of the net value, found by deducting from the appraised value the costs, expenses, and charges for the care, custody, and control of the property, and the costs of the suit from the appraised value, would be a fair award; and it is so ordered.