## THE OXFORD.

### SWEETING et al. v. THE OXFORD et al.

(District Court, S. D. Florida. March, 1894.)

**1. SALVAGE COMPENSATION—HOW MEASURED.**

The whole of a salvage service is to be considered together, and any bonus or gratuity may be measured by valuable, energetic action, and exposure of person or property; but, when the amount is necessarily limited to a mere compensation for work and labor, it should not be reduced by anything short of gross negligence or dishonesty and fraud.

**2. SAME—AMOUNT.**

$37,114 allowed upon a valuation of $155,000 for services of some 65 sailing vessels and four steamers, with 500 men, in discharging and carrying to Key West a cargo of sugar from a steamer grounded in a dangerous position on the Florida Reefs, and for floating her and bringing her disabled to the same place; the service lasting during 13 days, and much of it prosecuted at night and in rough weather.

This was a salvage case, in which separate libels were filed by Thomas B. Sweeting and others, and O. J. Kendal and others, against the steamship Oxford and cargo; and an intervening petition was presented by the Davis Coast Wrecking Company.

Geo. W. Allen and J. Vening Harris, for libelants.

J. B. Browne, for respondent.

LOCKE, District Judge. This vessel, a large steamship, laden with about 4,000 tons of sugar, bound from Cardenas to Philadelphia, went ashore early in the morning of 11th of February, 1894, upon a projecting point of Florida Reef known as "Conch Reef," about 100 miles northeast of the port of Key West. The place was a dangerous one, and one upon which several vessels have been wrecked, and was exposed to the full force of the sea from the northeast and around to south. A portion of the libelants herein, seeing the vessel aground, went to her assistance, and tendered their services, at about half-past 8 o'clock a. m. At first the master thought he might be able to float his vessel without aid, but finally, later in the day, agreed to accept the services of the several vessels and their crews which had arrived, and at about 12 o'clock permitted them to carry out a heavy anchor and hawser in the direction which he himself designated as the one which he considered the most proper, which was off the starboard quarter, trending well astern. The vessel, at the time of going ashore, had gone with such force and speed as to drive herself several feet out of the water, so that, at the time of the libelants' sounding around her, she was found to be in some four feet less water than when floating, with an uneven bottom. The anchor, weighing some three tons, with a

large hawser and fifteen fathoms of heavy chain, was carried out in the direction selected by the master, and let go. The libelants then suggested to the master that some of the cargo be transshipped to their vessels, in order that, when the tide arose, they might be able to float the steamship, but he declined to have any of the cargo taken out at that time. Later in the afternoon, when nearly dark, the master suggested that another hawser be run out, and furnished libelants a steel cable. By this time the wind had increased, together with the force and violence of the sea, so that it was with great difficulty that the cable was taken out. The instructions of the master and the efforts of the libelants were to make the steel cable fast to the heavy chain attached to the anchor which had already been dropped in seven fathoms of water, and a large iron shackle was furnished them for that purpose; but by that time the wind and sea had so increased that it was impossible, as alleged by the libelants, to bring the chain to the top of the water, so as to attach the shackle and the steel cable to it, and the cable was therefore made fast to the bight of the hawser, and the libelants returned on board the steamship. In the meantime another hawser had been carried off from the starboard bow of the steamship trending towards the stern, and the master had permitted libelants to commence discharging cargo into their vessels. As the tide arose, heavy strains were hove upon the steel cable and both hawsers by the steam power of the capstan and the winches of the vessel and the men on board the steamship, when both hawsers and cable parted, and the vessel remained upon the bottom.

It is alleged by the respondents that, before the parting of said hawser and cable, the vessel had started several feet from the bottom; but upon this point there is much conflicting evidence. After the parting of the hawsers, the wind and sea were so rough that it was impossible to do anything further that night about an anchor, but they continued discharging cargo. Early in the morning a steamer that had arrived (the O. C. Williams) went out and picked up the chain attached to the anchor, and made the steel hawser fast to it. The vessel being at that time so hard aground, it was conceded by all parties that it would be impossible to move her without lightening her of more of her cargo. The libelants continued loading sugar into their vessels, and bringing same to Key West. The weather increased in severity to such extent that at one time all of the sailing vessels were compelled to leave the vicinity of the steamship, and go into harbor for safety, there being but one steamer (the O. C. Williams) that was able to remain in the vicinity of the steamship during the entire service. The salvors were increased in numbers by vessels coming to their aid, until in all there were between 60 and 70 sailing vessels of different sizes and 4 steamers and about 500 men engaged in the service. In the meantime the steamship had sprung a leak, and finally filled with water, so that at one time the sea was washing over her upper deck. In addition to the steam vessels which had come to her aid, there were several steam pumps brought and used to free her from water. It is unnecessary to review in detail each day's work. Most of the time the pumps

were running day and night, and several nights the salvors were discharging cargo. The labor of discharging the cargo, pumping the vessel clear of water, and towing her to port occupied 13 days. Finally, the vessel being pumped nearly free from water, and much of the cargo having been taken out, and a large portion of that which was not taken out having been dissolved by the water and pumped out, she was finally relieved from the bottom, and brought to Key West.

It is claimed by the respondents that the salvors were lacking in energy in their work; that it was through their fault that the steel cable was not made fast to the chain, but to the hawser, which caused it to part on the first night, and had it not been for this the steamship would have been floated.

Salvors are expected to do everything within their power to relieve property the custodian of which has accepted their aid; but it cannot be expected that they will accomplish impossibilities or work miracles in attempting to render salvage services, and all that can be demanded is honest exertion and diligence. The question which arises in this case is, was it within the power of the salvors, on the first night of the disaster, to have attached the steel cable to the chain, instead of attaching it to the hawser, as they did? The facts and circumstances attending the case have been fully testified to, and all that can be determined is that there appears to be a large preponderance of evidence to show that the salvors did everything which could reasonably be expected of them in endeavoring to perform that part of their duty. The anchor had been dropped in seven fathoms of water. The chain to which it was desired to make fast the steel cable weighed upward of 240 pounds to the fathom, making a total of upward of 1,600 pounds which it would be necessary to raise to the bow of the vessel before the shackle and cable could be made fast. The evidence shows that at this time it was dark, and that the sea was very high, and the wind and waves so severe, with a strong current running, that the vessel that was detailed for this duty was plunging and pitching into the sea so that it was impossible to stand upon her deck, and that the men were compelled to dive overboard under the water, in order to make the cable fast to the hawser as it was. Captain Baker, whose services upon this reef have been well known for years, and in whom I have every confidence as an able, energetic, and active salvor, was detailed to do this duty; and he testifies, positively and clearly, that it was impossible, under the circumstances, to attach the steel cable to the chain, as was desired.

Whether the vessel moved at all that night I consider very uncertain, as there appears no reason for her stopping with so much force as to break the several hawsers, if once she had started. The taking in of the slack of the hawser, cable, and chain which had been laid irregularly upon the bottom, the rush of the water forward from the reversed propeller, and the apparent change in direction of a light, caused probably by a slight swinging of the vessel, would account, I consider, for all the facts or appearances upon which it is

claimed she moved. Whether the vessel moved that night or not, the breaking of the hawsers was unquestionably the great misfortune of the service, and rendered it impossible for the salvors to float the vessel before she had sprung a leak, and thereby save much more property for its owners, as well as earn for themselves a larger compensation, with comparatively little labor and loss of time, instead of performing the amount of labor they have been compelled to do, under such circumstances that no reasonable salvage can adequately compensate them. Their inability to make this connection between the steamer and chain was their misfortune as much as it was that of the owners of the property; and, if it was beyond their power to accomplish it, they should be no more held responsible for it than for the ship's being so hard aground that she could not be floated. There can be no question about their honest, earnest, and energetic efforts; and it appears they were not furnished the steel cable until after it became too dark and the sea too rough for them to complete what they had attempted.

It is also claimed that, in discharging the cargo, the libelants were lacking in energy and force; and, while it must be admitted that this appears to have been the case to some extent, there are circumstances that would tend to partially excuse or explain the reason for no greater rapidity in the work of discharging. Many of the vessels were comparatively small; yet they were the best that could be obtained at that time for the service. The weather much of the time was very bad. The admission of the master of the steamship shows this to have been so. One vessel, a schooner of the ordinary cruising size, was capsized in the immediate vicinity of the steamship, and became a total loss. Frequently the vessels were driven from their anchorage, and were unable to lie in the vicinity of the steamship. Several of them suffered damage in broken rails and chafed and splintered timber. They were 100 miles from the port of Key West, to which place it was necessary to transfer the cargo, and much time was taken in going and returning. While pumping, the water became so thick that several of their pumps would not work, and constant diving was required to keep the strainers clear. For not having saved more cargo that they might possibly have saved, they will suffer largely in a diminution of salvage. The compensation of salvors depends upon the success of their efforts, and is measured to a certain extent by the amount and value of property saved by them; and while, from such lack of energy as would imply culpable negligence, or a lack of ordinary skill or good faith, the amount of salvage on that actually saved may be reduced, such negligence must be gross and willful to so affect any compensation for other services actually rendered. The whole service is to be considered together, and any bonus or gratuity may be measured by valuable, energetic action, and exposure of person or property; but when the amount given sinks to a mere quantum meruit, or compensation for work and labor, as it must in this case, it can be affected or reduced by nothing less than gross negligence, or dishonesty and fraud.

The question now for determination is, what would be a reasonable, fair, and just compensation for the salvors under the circum-

stances? Salvage is not a quantum meruit, or a compensation for work and labor only, but a gratuity or a bonus for the benefit of commerce, to be given for the encouragement of parties who may be called upon to render such service. The parties engaged in this service were mostly licensed wrecking vessels. The large number employed, on account of the length of time occupied by the service, will so divide any amount which can reasonably be given that the individual shares, instead of being a bonus or a gratuity as a salvage, will scarcely compensate them for the actual labor performed. That this has been the case is exceedingly to be regretted, but the amount cannot be increased on account of the large number of individuals employed to do a certain service. Unquestionably, the service could have been rendered by a much smaller number; but the parties upon whom it devolved to determine those who should be taken into the service have unquestionably acted honestly and in good faith. It was impossible for them to determine just what force might be required, or just when any of the vessels which had left for Key West with cargo would return. It may be true that the entire force of sailing vessels and men were not constantly engaged in the actual labor of the service, but they were waiting, ready to assist, or coming and returning to and from Key West with cargo. All those named, with the exception of one schooner which went to the assistance of another vessel in distress during the time, and two which left the work three days before the steamship floated, their services being no longer required, were occupied the entire time either in working or waiting, and could not engage in anything else. The steamers and pumps were constantly occupied in the service day and night. The long time occupied by the service was caused by the efforts of the salvors to pump out and float the vessel; and, although it is claimed that they did not use as much diligence and force in saving cargo as they should have done, there is no complaint but what everything that possibly could have been done with the appliances at command in freeing the vessel from water, and relieving her from the bottom, was done, and in as short a space of time as was possible.

The service was to a vessel in distress, was rendered in good faith, and with a reasonable degree of energy and skill; and a reasonable compensation should be allowed, although nothing that can be considered as a bonus or gratuity can be reached.

The vessel had been appraised in her present condition, by a board of appraisers appointed by the court, at $95,000, and the cargo at $60,000. To the appraisement of the vessel an objection has been made by the claimants, and evidence introduced tending to show that the value is not as great as is shown by this report, and a motion made for a new board of appraisement. Accepting such evidence, and construing it with all weight to which it is considered to be entitled, I do not deem it necessary to set aside the report of the appraisers, and appoint a new board. In appointing such board, great care was taken to select those who were considered the most competent and best qualified for the service of any of the entire community, and it would be impossible to appoint another

whose opinion as to the matter of value would be entitled to greater confidence or credit. While the representatives of the owners have objected to the valuation, they have failed to give us any information as to the actual value which can be relied upon. They have not informed us as to the actual cost of the vessel, or for what she has been valued for insurance.

The property was in immediate and great peril. The master was powerless to save it, or to obtain assistance in any way or by any means different from the parties who offered their aid and have performed the service. It was upon one of the most exposed and dangerous points of the reef. The weather was very bad; the cargo of the class and character that would amount to a total loss if not saved in a short length of time. The vessel, so exposed to a fierce sea, would unquestionably, if left to herself, have been so badly damaged and injured as to be a complete loss. The labor was disagreeable, hard, and attended with exposure and damage, both to person and property, far exceeding that of ordinary navigation. There has been no objection to the value of the cargo, and I do not deem it necessary to determine positively the actual value of the vessel in determining the amount of compensation. The amount which I deem reasonable as compensation would not be an unreasonable or an unusual rate per cent. even if she might prove to be of somewhat less value than the appraisers have reported. But, if she is of as great value, the percentage of proportion of her value given as a salvage compensation will be low, when her condition and the services rendered are considered. In The Kimberley, 40 Fed. 290, 20 per cent. of $490,000 was given, and upon an appeal a compromise effected for $100,000 salvage; in The Egypt, 17 Fed. 359, one-fifth of $250,000 was given, in addition to an amount of expenses which had been incurred by the salvors; in The Sandringham, 10 Fed. 562, one-fourth of $193,000; in The Tregurno, 50 Fed. 946, 22½ per cent. was given on $205,000, in addition to the services of a vessel employed and paid by the underwriters. In none of these cases was the property in greater danger than in this, nor the risk and exposure greater, the labor more severe or long-continued, nor the services of higher value to the property.

In order that the different interests represented by the vessel and cargo may be more readily and easily adjusted and settled, an amount to each will be decreed separately. After a careful consideration of the case, it is ordered that a decree for $21,125 salvage on the vessel, and $15,989.61 salvage upon a portion of the cargo saved and brought into this port, be entered, and that upon the payment of that amount, together with the costs, expenses, and charges herein, the property be restored to the claimant, for the benefit of the true and lawful owners thereof.