THE ADVANCE.

THE ALLIANCA.

THE SEGURANCA.

THE VIGILANCIA.

BROWN et al. v. THE ADVANCE et al.

(Circuit Court of Appeals, Second Circuit. April 6, 1896.)

MARITIME LIENS—LETTERS OF CREDIT—CONTRACT.
Where the freights were expressly pledged as security for money to be paid on drafts drawn pursuant to letters of credit, for the purpose of disbursing vessels in a foreign port, *held*, that a further agreement by the shipowners to "furnish any additional security they may desire,' whenever they see proper to demand it," did not, of itself, create a maritime lien on the ships themselves, nor any equitable assignment, which might be recognized on a distribution of surplus moneys. 63 Fed. 726, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

Willard Parker Butler, for appellants.

Edmund L. Baylies, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. These four cases grew out of the insolvency of the United States & Brazil Steamship Company. The business of this company; its financial needs; its methods of providing, by letters of credit in New York, the money necessary to disburse its vessels in Brazilian ports; its insolvency; the claims for maritime liens which sprang up upon its failure; and the principles of law which this court deemed applicable to some of these claims;—were stated in the opinion recently given in the case of Huntington v. Proceeds of The Advance, 72 Fed. 793. The additional facts which are of importance in these cases are as follows: The libelants are the partners composing the banking house of Brown Bros. & Co., of New York City, and the London banking house of Brown, Shipley & Co. Brown, Shipley & Co. issued in New York City, upon the express request, in New York City, of the owner of these vessels, four letters of credit,—the first dated July 13, 1892, for £2,000; the second dated September 24, 1892, for £8,000; the third on September 29, 1892 (but no claim in respect to this letter is made); and the fourth dated November 29, 1892, for £8,000. Each of these letters was issued, in whole or in part, for the purpose of enabling the steamship company to disburse its vessels in Brazilian ports. Each letter contained upon its back the written agreement of the steamship company as follows:

"All the freight moneys earned and to be earned, and the policies of insurance thereon, are hereby pledged and hypothecated to them [Brown, Shipley & Co.] as collateral security for the payment as above promised [of the bills drawn by virtue of said credit]; and we further agree to give them any additional security they may require, whenever they may see proper to demand it."

Drafts were drawn under these letters of credit between November 9, 1892, and January 21, 1893. Not being payable until after 90 days' sight, the first one was paid March 2, 1893, and the last one was paid April 24, 1893. On February 23, 1893, Brown Bros. & Co. wrote to the president of the steamship company that one of the letters of credit had been canceled, and furthermore as follows:

"We also request that you deposit with us the securities called for by the various letters of credit, amounting to ———."

No other demand was made, unless the filing of the libels can be considered a demand, and no additional security was deposited or furnished by the company. On March 18, 1893, a receiver was appointed for the corporation, and subsequently all of its steamers were sold under libels filed to enforce maritime liens. These four libels were brought upon the ground that the libelants had a maritime lien against the four named vessels, to recover from their proceeds such portion of the avails of the drafts drawn under the letters of credit as had been applied towards paying the disbursements of the respective vessels in foreign ports upon their voyages during the latter part of 1892. The entire sums alleged to be due were between $52,000 and $53,000. The district court dismissed the libels. The question in the case is whether, upon the foregoing facts, a maritime lien existed in favor of the libelants upon the named vessels.

It may now be considered as settled that the owner of these vessels had given, by express agreement made in the home port, a maritime lien upon the freights of the vessels which were to be "disbursed" in foreign ports by the necessary aid of the letters of credit, and that these letters were issued in part, at least, upon the strength of the security furnished by this maritime lien, and that the owner had the power, if it so chose, of entering into an express contract, or contract proved by the circumstances, which should place a maritime lien upon the vessels also. The libelants say that when the owner agreed to give them "any additional security they require, whenever they may see proper to demand it," this agreement was a maritime lien upon the vessels, because such a lien was the usual security which material men had when they advanced money in a foreign port for the benefit of vessels, and because such a lien was the only additional security which the owner had in its power to give. The conclusion of the libelants, which was that an unexecuted promise to furnish whatever additional security was required created a maritime lien upon the vessels, is a non sequitur. The promise is capable of two constructions,—one, that the owner would furnish additional security when required; the other, that it would furnish that particular additional security which should be asked for. Whichever construction is given to it, the unfulfilled promise does not create a lien upon the vessels, for such a lien is the result of a contract evidenced by the express agreement or by the conduct of the parties. An unfulfilled contract that it would furnish security of some kind cannot be turned into an executed contract for a particular maritime lien. Neither can a maritime lien upon the vessels be created out of a contract to furnish the kind of security which was asked for, for

the letter of February 23d was silent as to the kind of security required. An existing maritime lien upon the vessels cannot be evolved out of a general promise that the owner would furnish more security when it was asked for, without any intermediate progressive steps in the development of the lien. We agree with the district judge when he says:

"The agreement 'to give further security' would have been as truly fulfilled by giving further personal security as by giving a further maritime lien. So indefinite an agreement does not constitute, of itself, any lien upon the vessels, nor even any equitable assignment or appropriation, such as might be recognized on a distribution of surplus moneys; nor does it extend the maritime lien beyond that specified and agreed upon at the time."

The decrees of the district court are affirmed, with costs.