## THE ELLA.

### NEAFIE & LEVY SHIP & ENGINE BUILDING CO. v. THE ELLA.

(District Court, D. Delaware. December 10, 1897.)

No. 553.

1. MARITIME LIENS—NECESSARY REPAIRS.
   Repairs to a vessel are necessary, within the meaning of the maritime law, where they are such as would be ordered by any prudent shipowner for the purpose of fitting and equipping her for efficient maritime service of the character for which she is designed or employed.

2. SAME—REPAIRS ON OWNER'S ORDER.
   The maritime law does not recognize any lien on a vessel for repairs furnished in a foreign port on the direct order of the owner in person, unless there is an agreement, express or implied, for a lien: but if there be a common understanding on the part of the repairer and the owner that the furnishing of necessary repairs is to proceed upon the basis of a lien or of extension of credit to the ship as well as to the owner or master, there is an implied agreement or contract for a lien, and a lien will be recognized and enforced.

3. SAME—PRESUMPTIONS.
   Where necessary repairs have been furnished to a vessel in a foreign port on the direct order of the owner who is present, there is a presumption that the repairs were furnished, not on the credit of the vessel, but solely on that of the owner: but this presumption is not conclusive. It may be rebutted by an implied agreement for a lien. Such implied agreement does not serve to create a lien de novo, but merely to overcome the presumption that credit is given exclusively to the owner.

4. SAME—WAIVER OF LIEN—GIVING NOTE—PRESUMPTIONS.
   The mere acceptance by a person, entitled to a maritime lien for repairs, of a promissory note of the owner of the ship repaired, does not defeat the lien. There is a presumption that the note is taken only as collateral security; and this presumption continues unless it affirmatively appears that the note was taken with an intention that it should extinguish the lien.

5. SAME—INNOCENT PURCHASERS—ADVANCES.
   Neither a bill of sale nor a mortgage of a vessel given to secure an antecedent indebtedness will confer upon the vendee or mortgagee the rights of a purchaser for value or affect the existence or enforcement of a maritime lien; but money advanced in consideration of the execution of a bill of sale or mortgage of a vessel will constitute the vendee or mortgagee a purchaser for value; and if the money has been advanced without notice, actual or constructive, of the existence of a maritime lien, the vendee or mortgagee will, in proceedings to enforce such lien, be treated as an innocent purchaser for value.

6. SAME—ENFORCEMENT OF LIEN—UNREASONABLE DELAY.
   A maritime lien is not in any case directly defeated by an innocent purchase for value. The effect of such a purchase is that proceedings for

the enforcement of the lien must be instituted without unreasonable delay, and what is unreasonable delay must be tested by what constitutes a fair opportunity, by the exercise of reasonable diligence, to arrest the vessel.

7. SALE OF VESSEL—PURCHASE FROM CORPORATION BY ITS PRESIDENT—RIGHTS OF THIRD PARTIES—NOTICE.

Where one claims title to a vessel under a bill of sale from a corporation, of which he was at the time president, he is, for the protection of innocent third persons, chargeable with knowledge of all material facts which would have been disclosed to him if he had exercised the duties of his office with reasonable circumspection.

8. MARITIME LIENS—LIBEL IN REM—COSTS.

The fact that a libel in rem is filed for repairs before the maturity of a promissory note given for the price, and still held by the libelant, does not defeat the suit, but at most merely affects the question of costs.

(Syllabus by the Court.)

Levi C. Bird and Andrew E. Sanborn, for libelant.
Lewis C. Vandegrift, for claimant.

BRADFORD, District Judge. In this case The Neafie and Levy Ship and Engine Building Company, a corporation of Pennsylvania, filed September 30, 1896, a libel in rem against the steamboat Ella to recover the price of repairs supplied to her by the libelant in Philadelphia from May 21, 1895, to May 30, 1896, inclusive, amounting to $1123.31, together with interest thereon from the last mentioned date. While the repairs were being furnished, the Ella was owned solely by The Philadelphia and Smyrna Transportation Company, a corporation of Delaware, and Alfred H. Smith during that time was her master. The transportation company executed a bill of sale of the Ella to John H. Hoffecker, the claimant, August 21, 1896, and from that time the claimant was the real or apparent owner of the vessel until she was sold October 19, 1896, under a writ of venditioni exponas issuing out of this court for the enforcement of a wharfage lien. The sale was confirmed and the purchase money, $6200, was paid into the registry of the court. Subsequently, $1075.54, parcel of the said sum of $6200, was applied to the satisfaction of certain lien claims and costs against the Ella, leaving $5124.46 in the registry as the balance of the proceeds of said sale.

It is admitted that the items contained in the schedule annexed to the libel were furnished, and that the charges therefor are reasonable; and it clearly appears that Philadelphia was a port foreign to the Ella, in the sense of being a port in a state other than that in which she was owned, when the repairs were furnished.

The vital questions in the case are two; first, whether the libelant by furnishing the repairs acquired a lien of a maritime nature against the Ella; and, secondly, whether if such a lien existed, the libelant is entitled to payment of its demand out of the balance of the proceeds in the registry.

The evidence as to the existence of a lien is voluminous, and largely circumstantial, and has required and received careful scrutiny and consideration. In view of the character of the items set forth in the schedule and of the testimony relative thereto, the repairs were necessary, within the meaning of the maritime law. They were not only

in aid of commerce and navigation, but were such as would be ordered by any prudent shipowner, engaged in business similar to that of the transportation company, for the purpose of fitting and equipping his vessel for efficient maritime service. The repairs were necessary and were furnished by the libelant to the Ella in a foreign port. But it does not follow from these facts alone that a maritime lien arose or was created. It was requisite that the repairs should have been furnished on the credit of the vessel. It is necessary to determine, among other things, with whom the libelant dealt in the transaction in order to ascertain whether they were furnished on her credit. Did it deal with the transportation company, or with the master qua master, or with both of them? The libel states that "the owners of the said steamboat 'Ella,' by themselves or through the said Alfred H. Smith, Master as aforesaid, acting as the agent of the said owners, applied to the libelant to furnish repairs for said steamboat," and that "the libelant, accordingly, in pursuance of the said contract, and orders given it from time to time, made the various repairs to the said steamboat 'Ella,' set forth in the account or schedule hereto annexed," etc. The answer states that the claimant admits that "the owners of the steamboat 'Ella' applied to the libelant to furnish repairs for said steamboat," and avers that "the libelant in pursuance of a contract made with the then owners of said steamboat 'Ella' and orders given from time to time by the then owners of said steamboat to the libelant" made the repairs in question. Much light is shed upon the point now under consideration by the course of dealing between the libelant and transportation company for years prior to the furnishing of the repairs in question as well as by the circumstances attending that transaction.

The libelant was incorporated in March, 1891, under the laws of Pennsylvania, for the purpose of constructing and repairing vessels propelled by steam, and succeeded to the property and business of the long established firm of Neafie & Levy, of which Jacob G. Neafie, the president of the libelant, was a member. The character of the business conducted by the libelant was substantially the same as that for many years carried on by Neafie & Levy. The transportation company was incorporated in February, 1883, under the laws of Delaware, for the purpose of transporting freight by vessel between the town of Smyrna, Delaware, and the city of Philadelphia, or elsewhere in the Delaware river and bay, or any navigable waters. The claimant was among its incorporators and became its president five or six years prior to the furnishing of the repairs and has continued to hold and now holds that office. Under its charter the transportation company engaged in the carriage of freight by vessel to and from Smyrna and Philadelphia, regular trips being made over the route several times a week. It had its main office in Smyrna and also had a small steamboat office on pier No. 9 in Philadelphia. In 1889 it became the owner of the Ella and continued to own her until after the repairs had been furnished. There is no evidence that at any time during the period between the acquisition of the Ella and the completion of the repairs any other vessel was operated by that company on its route, or was owned by it. Before and substantially until the transportation

company became the owner of the Ella, it owned and operated on its route a steamboat called the John E. Tygert, and some of the correspondence between Neafie & Levy and the transportation company relates to that vessel.

Augustus E. Jardine became connected with the transportation company in September, 1885, as general manager. He subsequently became its secretary and treasurer, which offices he has held for about ten years. It appears from the evidence, documentary as well as oral, that, while secretary and treasurer, he was also the general manager of the transportation company, and was dealt with as such. Correspondence intended for that company and relating to its affairs was indifferently addressed to the company and to Jardine. Whether or not constituted general manager by formal action of the company, he performed the functions of such an office; and it nowhere appears that his authority so to act was questioned in any quarter. His dealings on behalf of the company, if not expressly authorized, were acquiesced in by it. The claimant, in answer to the question, "And you had the general charge of the affairs of the corporation as president?" testifies, "I don't think so. I think those things were in the care and hands of the secretary and treasurer." He further testifies, "I didn't keep any run of the affairs of the company; Mr. Jardine was the general manager and run the affairs of the company." That Jardine was regarded by both Neafie & Levy and the libelant as one in authority in the transportation company, clothed with the powers of a general manager, is clear. From the organization of that company Neafie & Levy or the libelant had furnished repairs to its vessels, and such of the correspondence since that time as is in evidence shows that Jardine assumed to act in that capacity. Jacob G. Neafie, the president of the libelant, testified that he recognized Jardine as manager of the transportation company. The correspondence prior to the furnishing of the repairs in question shows direct dealings between Neafie & Levy and the libelant, on the one side, and the transportation company, on the other. Respondent's Exhibits G, G1, G4, G5, G8, G10, G13, H, I, J, K. It appears, from the manner in which this correspondence was addressed or signed, as shown by the exhibits, not only that Jardine acted and was recognized as the principal agent or general manager of the transportation company, but, further, that where reference is made to Smith, he is regarded rather as a direct agent of that company with respect to the work or repairs mentioned in the correspondence than as master qua master. From the time the transportation company became the owner of the Ella in 1889 until after the repairs in question had been completed all repairs to her had been almost exclusively furnished by Neafie & Levy or the libelant; Smith testifying that it was "only twice since we owned the 'Ella' that we went elsewhere." The oral testimony as to the course of dealing between the transportation company and Neafie & Levy and the libelant in the ordering and furnishing of repairs, while at first sight conflicting and apparently irreconcilable, upon careful examination will be found, when taken as a whole, to be in the main consistent with the inference drawn from the correspondence. The Ella every year received a general overhauling at the yard of the

libelant. It was called her annual spring overhauling, and included such general repairs as to make her seaworthy and keep her in good condition. She was overhauled usually in May or June. As occasion required, however, she was sent at other times to receive repairs. From time to time the transportation company by letter or through Smith, who was in constant communication with the company, arranged with the libelant for the use of its marine railway in connection with the repairing of the vessel, and, the time having been agreed upon, the patrons of the line were notified by advertisement of the fact that the Ella would be temporarily withdrawn from the route. Before she was sent to be overhauled Jardine and Smith conferred together and agreed upon the needed repairs. Such repairs were ordered either by correspondence between the transportation company and the libelant or, when the vessel was at the yard of the libelant, by Smith usually, or by Jardine occasionally, and sometimes by one of them in the presence of the other. Smith remained with the Ella while being overhauled to superintend the work and to order such repairs as were necessary to the proper completion of the repairs agreed upon. It is true that Smith testifies that when he was at the yard he was consulted by the officers or employés of the libelant as to the required repairs and that he ordered such repairs as he wanted which were furnished accordingly. But this statement is consistent with the evidence that the vessel was there by prearrangement between the transportation company and the libelant, and that he was there in charge of the executive details of work which had been discussed and generally agreed upon by Jardine and himself in Smyrna. It is also true that Smith from time to time ordered casual repairs for the Ella in the absence of any correspondence relating to them between the transportation company and the libelant. But it appears that the libelant never looked to Smith for payment or, in supplying such repairs, in anywise gave credit to him. All bills were sent to the transportation company as the owner of the vessel. It may seriously be doubted whether Smith's testimony, when carefully examined, in connection with the general course of dealing between the transportation company and the libelant, as disclosed by the correspondence and other evidence, does not show that in ordering such casual repairs he was acting rather as a direct representative of the transportation company than in the character of master of a ship in a foreign port. But, however this may be, there can be no doubt that prior to the furnishing of the repairs in question the general course of dealing in the repairing of the vessels of the transportation company by the libelant or Neafie & Levy was through direct negotiations between that company and the repairer. Such having been the course of dealing prior to May, 1895, it must be assumed, unless the contrary appears, that it was not abandoned with respect to the repairs in question. It is unnecessary, however, to rely upon such an assumption. The evidence shows that the usual course of dealing was continued. The metallic life boat and the repairs to the rudder of the Ella, included in the bill of particulars, were subjects of direct correspondence between the transportation company and the libelant. Respondent's Exhibits

N and L. The smokestack, included in the bill of particulars, was also the subject of direct negotiations between the two companies. In May, 1895, shortly before the spring overhauling for that year, Jardine and Smith were in the office of the libelant in consultation with its officers in relation to some of the repairs in question, and on that occasion Smith in the presence of Jardine stated to the president of the libelant what he wanted done in the way of repairs. It also appears that the items in the bill of particulars in May and June represent work that was planned in advance and arranged for between the transportation company and the libelant and that the use of the marine railway was secured by direct negotiations between Jardine or Smith and the libelant. The evidence thus supports the presumption that the usual course of dealing between the transportation company and the libelant in former years continued during the period of the furnishing of the repairs in question. An analysis of the items contained in the bill of particulars shows that ninety five per cent. of the amount of the claim consists of charges for spring repairs, use of the railway at other times, the metallic life boat, the smokestack and the rudder. All these items were the subject of direct dealings between the transportation company and the libelant. The remaining items, comparatively insignificant in amount, may have been ordered by Smith in the absence of any correspondence between the two companies and of any consultation with Jardine. But, in view of the general mode of dealing, the furnishing of these casual or incidental repairs does not warrant an inference that they were regarded either by the libelant or the transportation company as an exception to or departure from the customary course. Certainly, there is nothing in the evidence, written or oral, to support such an inference. The evidence, taken as a whole, leads to a conviction that the relation of Jardine and Smith to the transportation company, with respect to the furnishing of the repairs in question, was that of agents to their principal; that the acts and orders of Jardine and Smith in the premises were those of that company; and that, notwithstanding some testimony to the contrary, the libelant must be considered in law to have dealt directly with that company, and not with Smith in the character of master.

This case must, therefore, be treated as belonging to the class in which repairs or supplies are furnished to a ship in a foreign port on the direct order of the owner. Section 1 of the statute of Pennsylvania of June 13, 1836, as amended June 24, 1895, is as follows:

"Ships and vessels of all kinds built, repaired, fitted, furnished and supplied with necessaries for navigation within this commonwealth shall be subject to a lien for all debts contracted by the builders, master, owners, agents or consignees thereof for work done or materials or supplies found or provided in the building, repairing, fitting, furnishing, supplying or equipping of the same in preference to any other debt due from the builders, master, owners, agents or consignees thereof." Laws 1895, p. 251.

It is, however, unnecessary to the decision of this case to consider the Pennsylvania statute. The libelant claims a lien as well under the general maritime law as under the act. No lien for re-

pairs will arise under the statute, unless they are furnished on the credit of the vessel. The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 396. And, if the statute be applicable to a foreign ship, the giving of credit to her must equally be established, whether the proceeding be under the statute or the general maritime law.

The maritime law does not recognize any lien on a vessel for repairs furnished in a foreign port on the direct order of the owner in person, unless there is an agreement, express or implied, for a lien. The law as to supplies is the same. If there is such an agreement a lien will be recognized and enforced. Neither a formal contract nor an express agreement is necessary. If there be a common understanding between the repairer and the owner that the furnishing of necessary repairs is to proceed upon the basis of a lien or of extension of credit to the ship as well as to the owner or master, there is an implied contract for a lien. It is true that in The Now Then, 50 Fed. 944, the court was of the opinion that, when the repairs are made in a foreign port "on the orders of the owner, the presumption of credit to the vessel does not arise, and in that case a lien will not exist except by the express contract of the parties." But the circuit court of appeals, in affirming the decree, while generally approving the law as laid down by the court below, apparently did not go so far on this point; seeming to consider the rule to be that, "when the work is done by order of the master, a lien is implied, but for work done by order of the owner no lien will exist unless proved by the agreement of the parties." 5 C. C. A. 206, 55 Fed. 523. This language is applicable equally to an implied or an express agreement for a lien, and, in view of more recent decisions, it must be presumed that the court did not intend to confine its application to express agreements.

The latest utterance by the supreme court upon this subject was in The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, where it was said that "in the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as made 'on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.'" In the same case the court recognizes that a lien would exist if there were either an "express agreement for a lien," or "circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred."

In The Kalorama, 10 Wall. 204, 214, the court said:

"Implied liens, it is said, can be created only by the master, but if it is meant by that proposition that the owner, or owners, if more than one, cannot order repairs and supplies on the credit of the vessel, the court cannot assent to the proposition, as the practice is constantly otherwise. Undoubtedly the presence of the owner defeats the implied authority of the master, but the presence of the owner would not destroy such credit as is necessary to furnish food to the mariners and save the vessel and cargo from the perils of the seas. More stringent rules apply as between one part owner and another, but the case is free from all difficulty if all the owners are present and the advances are made at their request, or by their directions, and under an agreement, express or implied, that the same are made on the credit of the vessel."

The existence of an express agreement may be shown by either direct or circumstantial evidence; and an express agreement is none the less express because circumstantial evidence is resorted to for its establishment. But an express agreement not being required, what circumstances will support or create an implied agreement for a lien?

In Stephenson v. The Francis, 21 Fed. 715, 719, 720, cited with approval in The Valencia, the court said:

"Supplies furnished to an owner in person, not being master, though in a foreign port, are presumptively furnished upon his personal responsibility only, where, as here, there is no reference made in the negotiations between the parties to the ship as a source of credit, and no other circumstances clearly indicate such a common intention. * * * When a known owner, not being master, procures necessary repairs or supplies in a foreign port, the question whether a maritime lien, i. e., an implied hypothecation of the ship, arises therefor, must depend upon the intention of the parties, to be gathered from the circumstances of the transaction. * * * In the state of the owner's residence, where he is presumptively present, or within easy communication, no mere maritime lien for repairs and supplies there furnished is by our law in any case allowed. In that case the presumption of law is conclusive that the owner or his representative is within reach; that he is able to supply his ship upon his ordinary responsibility; and that he intends to do so without burdening her with secret liens. In a foreign port, when the owner is present and procures the supplies in person, not being master, in the absence of any express reference to the ship as a source of credit, the same presumption as to the owner's means and as to his intention exists prima facie; but this presumption is not conclusive, as in the home port, and may be repelled by proof drawn either from the express language of the parties, or from any other circumstances satisfactorily showing that a credit of the ship was within the common intention; and when this intention appears the lien will be sustained."

This doctrine is recognized by Brewer, J., in The Glenmont, 34 Fed. 402, 404.

In Neill v. The Francis, 21 Fed. 921, 924, the court said that, where supplies are obtained in a foreign port on the personal order of the owner, "in order to hold the ship the material-man must show either an agreement or some circumstances indicating a common intention to bind the ship." In The Aeronaut, 36 Fed. 497, 499, the court said that "upon personal dealings with the general owners, or with charterers who are owners pro hac vice, for supplies to be furnished within the same port or state where the contract is made, the legal presumption is that the dealings are not with the ship, or upon her credit, but upon the ordinary personal responsibility of the owners, with whom the dealings are had, and no lien is, in such a case, sustained, unless a credit of the ship is proved to be within the intention of both parties." In The Stroma, 53 Fed. 281, 283, 284, the court said that the known general owner may "expressly pledge the credit of his vessel in a foreign port for supplies, and there often are circumstances and facts which show that the credit of the vessel was pledged in fact, though not in words, and that such credit was within the common intent of both parties," and also recognized that "acts or circumstances from which it can be inferred that the credit of the ship was either within the contemplation of both parties, or was recognized by both," are sufficient to support a lien. In The George Dumois, 66 Fed. 353, the court dismissed a

libel for supplies furnished to a ship in a foreign port on the personal order of the charterer because it was "not satisfied from the circumstances of the transaction, as shown by the proof, that there was a common understanding or intention to bind the ship." On appeal the decree was reversed. 15 C. C. A. 675, 68 Fed. 926. But it was not reversed upon the ground that a common understanding or intention to bind the ship as shown by the circumstances would not be sufficient for the recognition of a lien. On the contrary, the appellate court required less, and, after saying that "we understand the rule to be that, where necessary supplies are furnished to a ship in a foreign port, and they are received by the master, and used by him in the services of the ship, a maritime lien results, unless it shall appear that the furnisher of supplies did not rely upon the ship, but trusted solely to the personal credit of the owner; and the burden of proof in such a case to defeat the lien lies upon the ship and her claimants," applied that rule to a case of supplies furnished to a vessel, in a port foreign to both the owner and the charterer, on the personal order of the president of the corporation charterer who was present at the port of supply. While it seems that this holding on appeal in The George Dumois is inconsistent with the doctrine of the supreme court in The Valencia, the position of the court below, as to the sufficiency of a common understanding or intention, is in perfect accord with that doctrine. In The Columbus, 14 C. C. A. 522, 67 Fed. 553, 555, where towage service had been rendered on the order of the agent of the owner of a foreign dredging plant, the court said: "The material inquiry is, not whether the libelant himself may have contemplated a claim of lien, but whether a lien was created by or resulted from the mutual understanding of the parties and the services tendered in pursuance of it." In The Gracie May, 18 C. C. A. 559, 72 Fed. 283, where supplies had been ordered in a foreign port by the reputed owner, the court said that "the question of credit [to the vessel] must depend upon the facts and the probabilities, without the aid of technical presumptions." In The Advance, 19 C. C. A. 541, 73 Fed. 503, the court recognized that "a contract evidenced by the express agreement or by the conduct of the parties" might support a maritime lien which would not otherwise be sustained.

It thus appears that "an agreement, express or implied, for a lien," "circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred," "circumstances satisfactorily showing that a credit of the ship was within the common intention," "an agreement or some circumstances indicating a common intention to bind the ship," "a credit of the ship proved to be within the intention of both parties," "circumstances and facts which show that the credit of the vessel was pledged in fact though not in words, and that such credit was within the common intent of both parties," "acts or circumstances from which it can be inferred that the credit of the ship was either within the contemplation of both parties or was recognized by both," "circumstances of the transaction, as shown by the proof, that there was a common understanding or in-

tention to bind the ship," "the mutual understanding of the parties," "the facts and the probabilities without the aid of technical presumptions," and a contract evidenced by "the conduct of the parties," have severally been considered sufficient to support a lien. A common understanding for a lien is equivalent to a common intent to bind the ship; for when parties deal under such an understanding the ethics of the law will conclusively presume a common intent. A mutual understanding for a lien is susceptible of two meanings. If it be mutually expressed between the parties, it is an express agreement, and, as such, is not requisite, according to The Valencia, to support a lien. If it be not so expressed or communicated it will amount only to a common understanding; and the phrase was doubtless used in The Columbus in the latter sense, which accords with what seems to be the doctrine in The Valencia. Persons entering into an express contract for the furnishing of necessary repairs to a vessel in a foreign port under a common understanding that there is to be a lien impliedly contract for such lien. Otherwise the law would tolerate injustice, in many instances amounting to fraud. It is not believed that justice as administered in courts of admiralty will permit such a result. There is another consideration in this connection entitled to weight. Does an implied agreement for a lien, in the case of repairs furnished to a vessel in a foreign port on the direct order of the owner, serve to create a lien de novo, on the one hand, or, on the other, merely to overcome the presumption that credit is not given to the vessel, but exclusively to the owner? If there is a conclusive presumption that credit is given solely to the owner, it would follow that there must be an agreement in fact for a lien, whether proved by express contract or by circumstantial evidence. But if the presumption is disputable, as it rests upon the assumption that credit is given exclusively to the owner, a common understanding that credit is given to the vessel as well as to the owner will overcome the presumption, and a lien will remain as a lien given by the maritime law and not as a lien created de novo by the contract of the parties. The obvious distinction is between the rebutting of a disputable presumption of the non-existence of a lien, and the creation of a lien. There can be little doubt that the presumption of the non-existence of a lien in such a case is disputable.

The lien given by the maritime law for necessary repairs to a ship grows out of the necessities or convenience of maritime commerce, and is "tacitly created by the law," and "an appropriation made by the law, of a particular thing as security for the debt or claim,"—"a jus in re constituting an incumbrance on the property by operation of law." The J. E. Rumbell, 148 U. S. 1, 10, 13 Sup. Ct. 498; The Young Mechanic, 2 Curt. 404, Fed. Cas. No. 18,180; The Kiersage, 2 Curt. 421, Fed. Cas. No. 7,762. It is commonly termed a tacit hypothecation. In The Scotia, 35 Fed. 907, 909, 910, the court, speaking generally of liens given by the maritime law, said:

"The lien or privilege in all these cases is not properly created by the master at all; nor does it rest merely upon his authority. It is created by the

law of the place of the transaction. Where the law gives the lien, the master's authority is, therefore, not in question, save as respects his right to do those acts, or to make those contracts, to which the law of the place attaches the lien. * * * These implied liens, therefore, if they exist at all, exist by virtue of the law applicable to the transaction, whether of contract or of tort."

The giving of credit to the ship is essential to the existence of a lien for repairs. The maritime law as recognized in this country does not in any case give a lien for repairs furnished to a vessel in a port of the state to which she belongs; for it is conclusively presumed that they were furnished, not on the credit of the vessel, but exclusively on the credit of the owner. In such case there is no implied hypothecation. But where necessary repairs have been furnished to a ship, in a port of a state to which she does not belong, on her credit, the maritime law gives a lien on the ship by tacit hypothecation to secure payment for such repairs. When necessary repairs are furnished to a vessel in a foreign port on the order of the master, nothing else appearing, there is a prima facie presumption that they were furnished on the credit of the vessel as well as of the owner, and an implied lien is given; but this presumption may be overcome and the existence of a lien negatived by circumstances showing that those furnishing the repairs did not act in good faith toward the owner of the vessel or omitted to exercise reasonable circumspection touching the necessity of credit to the vessel. On the other hand, where necessary repairs have been furnished to a vessel in a foreign port on the direct order of the owner who is present, there is a presumption that the repairs were furnished, not on the credit of the vessel, but solely on that of the owner. But this presumption is not conclusive. It may be rebutted by circumstances. No case decided by the supreme court has been found in which such presumption has been either held or declared to be conclusive. It is true that in Ferry Co. v. Beers, 20 How. 393, 402, the court said that "where the owner is present no lien is acquired by the material men;" but this language evidently had reference to the doctrine that where the owner is present the authority of the master to pledge the credit of the vessel is suspended for the time being. Chief Justice Taney, in his dissenting opinion in Thomas v. Osborn, 19 How. 22, 38, said: "Now, if Leach is to be regarded as owner for the time when he was sailing the Laura under the agreement, then by the maritime law the repairs and supplies furnished at his request are presumed to have been furnished upon his personal credit, unless the contrary appears." The repairs and supplies had been furnished to a ship in a foreign port, and the language above quoted is in nowise inconsistent with either the reasoning or the decision of the court. Brewer, J., in The Glenmont, 34 Fed. 402, 404, and Brown, J., in Stephenson v. The Francis, 21 Fed. 715, 720, while holding that a tacit hypothecation does not exist for repairs or supplies furnished to a ship in a port of the state to which she belongs, recognized that the presumption that necessary repairs and supplies furnished in a foreign port and procured directly by the owner are furnished upon his sole credit is "not conclusive, as in the home port," and may be rebutted by circumstances. In view of the foregoing considerations and authorities, a common understand-

84 F.—31

ing on the part of the libelant and the transportation company, gathered from all the circumstances of the case, that the furnishing of the repairs to the Ella was to proceed upon the basis of credit to the vessel as well as to the transportation company, would rebut the presumption of the non-existence of a lien arising from the course of direct dealings between the two companies. A contract in fact for a lien, established directly or by circumstantial evidence, is not required. To establish such a common understanding, proof beyond reasonable doubt, as in criminal cases, is not required, but, as in other civil cases, a mere preponderance, in its legal sense, of the evidence, direct or circumstantial.

After careful examination I am satisfied from the evidence that the repairs were furnished to the Ella upon a common understanding that credit was to be given to her as well as to the transportation company, and, consequently, that a lien was given by the maritime law. That the libelant understood and intended that the vessel should be bound for the repairs is clear. The claimant, though president of the transportation company, had never been at the yard of the libelant, and there is no evidence that he personally ever met or knew any of its officers. Indeed the evidence points the other way. Jardine was a comparative stranger to the libelant, although from time to time at its yard. Neafie, its president, testifies that he would not know him, if he saw him. There is no evidence that any of the other officers of the transportation company were at any time during a number of years prior to the furnishing of the repairs known to the libelant. The libelant, while aware that the transportation company was a foreign corporation, never inquired and knew absolutely nothing about its financial condition or standing. Seddinger, vice-president of the libelant, testifies that "we did not know the owners, we did not know whether they were worth ten cents or ten thousand dollars," and that "we made no inquiries about the standing of the company. We knew nothing about the company. We didn't know whether the officers or the individual members of the company were worth anything or not." Neafie fully corroborates Seddinger on this point and their testimony is not in any manner discredited. In fact, a close analysis of the figures given by Jardine in his testimony as representing the amount of the assets and liabilities of the transportation company during several years. in connection with his testimony as to the basis on which the valuation of the assets was made and as to the amount realized on the sale of all the property of that company, shows that the company was during the whole period of the furnishing of the repairs in question on the verge of insolvency. But, aside from that fact, it is, to say the least, extremely improbable that the libelant should, in furnishing the repairs, have relied for payment exclusively upon a foreign owner of unknown financial standing. It is equally improbable that, if the libelant intended wholly to disregard the vessel as security and rely solely upon the transportation company, it should have failed to make any inquiry as to the financial condition or standing of that company. The known course of business dealings raises a violent presumption against an intent on the part of the libelant to give credit exclusively to that company.

The evidence shows that prior to the furnishing of the repairs in question the transportation company was sometimes very dilatory in paying the libelant for repairs to the Ella, bills rendered remaining unpaid for many months. In view of this circumstance it is difficult to account for the fact that the libelant never made any inquiry as to the financial condition or standing of the transportation company before furnishing further repairs to the Ella, except upon the supposition that the libelant looked to the vessel for payment. The Ella since 1889 had been making her regular trips, and was several times each week within reach of process in Philadelphia. She could be taken by the marshal of the eastern district of Pennsylvania on a warrant of arrest in a suit in rem, or on an attachment in a suit in personam, or by the sheriff of Philadelphia county on a foreign attachment. Under these circumstances, to assume that the libelant did not rely upon the Ella as security, in furnishing the repairs, but gave credit solely to her owner, of unknown financial ability and dilatory in payment, is to impute to the libelant such recklessness as is seldom, if ever, displayed in business dealings.

But, in addition to the inferences to be drawn from the probabilities, there is the direct and uncontradicted testimony of the officers of the libelant that it gave credit to the Ella and looked to her for payment; that no inquiry was made as to the financial condition of the transportation company, because they regarded the vessel as security; that, if the libelant had intended to rely upon the credit of that company, inquiry as to its financial condition would have been made; and that the invariable custom of the libelant in furnishing repairs was to charge them to the vessel repaired and to look to it for payment. This custom doubtless was based upon the Pennsylvania statute of 1836, above referred to, together with the principles of the general maritime law. While the observance of the custom would not in all cases justify a claim of lien for repairs, it, nevertheless, in connection with the other testimony and upon the presumption of fair dealing, furnishes strong evidence of an understanding on the part of the libelant that the repairs were furnished on the credit of the Ella and of an intent on its part to bind her for them. The repairs in question were all charged on the books of the libelant to "Steamer Ella and owners." This mode of charging has been termed a "self-serving practice"; and the fact that the charge is so made, standing alone, has but little weight upon the question whether credit has been given to the ship as well as to her owner. But, in so far as it has weight, it tends to establish, and not to negative, the existence of a maritime lien. Rowen, chief engineer of repairs for the libelant, who has for forty-two years been employed by it and Neafie & Levy, and who has not been discredited in any manner, testifies that "as soon as a boat arrived at the wharf in need of repairs" his "duty is first to go to the office and find out the standing of the boat, and then if I get a good report to go and ask orders," etc.; that he would ascertain the boat's financial standing by "asking questions of Mr. Neafie, the president of the company;" that "if the boat was in debt in the office, probably they would not allow me to go on

with repairs and the position I hold forces me to ask that question of any boat that comes in there;" that when the Ella came for repairs he did not go to work on her until he had first gone to the office and found out her financial standing; and that, when the Ella came to the yard of the libelant in 1895 and 1896 for her general overhauling he did not go to work on her "without consulting the office" as to her standing. Whether Smith, who always went with the Ella for her repairs, knew of the fact that before repairs were furnished her financial standing was inquired into, does not appear. Under the circumstances he may or may not have known this fact. No inference on that point is here drawn. There is no room for doubt that the libelant furnished the repairs in question with an understanding on its part that the Ella should be bound for them and with intent to rely upon her as security.

The evidence also shows, to say the least, an understanding on the part of the transportation company that these repairs were to be and were furnished on the credit of the Ella. Aside from the evidence bearing directly upon this point the course of dealing between the libelant and that company for a number of years prior to 1895 gives rise to a strong presumption that such was the case. Smith testifies that whenever the Ella was at the yard of the libelant for repairs he was always with her; that he did not expect the libelant to look to him for payment for any repairs; that he had no funds to pay for repairs; that he "ordered them in the name of the boat;" that he was there as "representative of The Philadelphia and Smyrna Transportation Company;" that he means by "representative," master; that if he "went and got anything it was charged to the 'Ella';" that he "was there to overhaul the boat and to have done what should be done to her;" that it was his "business when I went to the yard to have the work done, and I had it done by ordering it from Neafie & Levy, such as I wanted to be done and was necessary to be done to the boat;" that "Messrs. Neafie and Levy have done our work for a good many years and it seems as though we didn't know anywhere else,—I mean the last few years. We always went there. But if I wanted anything anywhere else, I went and got it and had it charged to the steamer. * * * Anything that appertained to the boat. It would only be something for the boat. For instance, life preservers or a metallic life boat, charge it to the Ella. Of course, if I wanted to buy anything for the Philadelphia and Smyrna Transportation Company not pertaining to the boat, I would say to charge it to the transportation company;" and that since he became master of the Ella he has had no knowledge of any understanding or agreement between the libelant and the transportation company that repairs furnished to her by the former were furnished on the credit of the latter and not on the credit of the boat. It thus appears from the testimony of Smith, and there is nothing to contradict it, that whether repairs or supplies to the Ella were ordered from the libelant or elsewhere, he had them charged to the vessel. It must be assumed in the absence of evidence to the contrary, that in his testimony he spoke as a seaman

and not as a bookkeeper, and, therefore, that he understood and intended that such repairs or supplies should be furnished on the credit of the vessel. This assumption is further justified by his express recognition of the distinction between things appertaining to the vessel and things not so appertaining. The former he had charged to the Ella while he had the latter charged to the transportation company. In view of the relations between Smith and Jardine with respect to the furnishing of repairs to the Ella since 1889, it is not an unreasonable inference that the latter was cognizant of the fact that repairs were ordered by Smith and furnished by the libelant on the credit of the vessel, and that Jardine either authorized or acquiesced in the use of that credit to obtain needed repairs. But the case does not rest solely upon that inference. There are many circumstances which, considered collectively, remove all doubt on this point. Not only were the bills for repairs, rendered by the libelant to the transportation company, made out against "Steamer Ella and owners," but the correspondence relating to those bills contained practically a repeated assertion by the libelant of a lien upon the vessel. Libelant's Exhibits 13, 13a, 13b, 13d; Respondent's Exhibits B, G15, C. It is sufficient to refer to only one of these letters as they all alike treat bills for repairs as charges against the vessel. The libelant wrote, under date of January 20, 1891, to the transportation company: "We are in receipt of your favor 19th inst., covering your check for $500.00 on acct. of our bills against your str. 'Ella' which we have placed to her credit," etc. Libelant's Exhibit 13. The same course was pursued with respect to the bills rendered by Neafie & Levy to the transportation company against the steamer John E. Tygert. Respondent's Exhibits G2, G6, G7, G9. This correspondence taken in connection with the testimony of Smith, the relations of Smith to Jardine, and the manner in which bills were rendered to the transportation company, affords persuasive evidence of an understanding on the part of that company that, prior to the furnishing of the repairs in question, it was dealing with Neafie & Levy and the libelant on the credit of the vessel, and, therefore, on the basis of a lien. With a single exception, the evidence does not disclose that either the libelant or Neafie & Levy ever rendered to the transportation company any bill made out to it personally, and not against the Ella or the John E. Tygert. Sometimes repairs to vessels are charged against them by name as a matter of convenience in keeping accounts, although there is no intention of asserting a lien. But this consideration loses much of its force when, as here, the owner is operating only one vessel and practically all of the indebtedness has accrued through the furnishing of necessary repairs to that vessel. All the bills from and including 1890 to the bringing of this suit were for repairs furnished by the libelant or Neafie & Levy to the Ella, with possibly one exception relating to certain grate bars. Neafie & Levy rendered a bill for these bars dated March 15, 1890, amounting to $5.85. Whether the bars were furnished to the Ella for her use or to the transportation company for some other use is not disclosed. The libelant having

succeeded to the rights and liabilities of Neafie & Levy, wrote August 6, 1891, [Libelant's Exhibit 13C,] to the transportation company in relation to the bars, as follows:

"Philadelphia, Aug. 6th, 1891.

"Philada. & Smyrna Trans. Co., A. E. Jardine, Sec.—Dear Sir: In reply to yours 5th inst. we send you duplicate bill for Dec/90 of $242.02 for str. 'Ella.' The item of $5.85 was for grate bars charged to your company not to the 'Ella,' hence was not on the 'Ella's' statement.  The account Jan. 1/91 stands thus:

| | |
|---|---:|
| Ella ...................................................................................................... | $2232 05 |
| Phila. & S. T. Co..................................................................................... | 5 85 |

$2237 90

"Yours, truly,                     The Neafie & Levy S. & E. B. Co.,
                                         "Chas. Halyburton, Treas."

This letter presented in sharp contrast a charge made against the transportation company personally and charges made against the Ella.  It is unreasonable to suppose that the distinction was not recognized by that company.  The customary form of correspondence was employed during and after the furnishing of the repairs in question.  Libelant's Exhibits 1, 2, 7.

All this correspondence is in perfect accord with, and strongly tends to show, an understanding on the part of the transportation company that the repairs were to be furnished on the credit of the Ella.  In view of the course of dealing and correspondence prior to May, 1895, it is not to be assumed, in the absence of evidence, that there was a departure therefrom with respect to the repairs in question.  That these repairs were furnished with an understanding on the part of the transportation company that a lien was to be acquired is shown not only by its former dealings with the libelant, but by evidence bearing more immediately upon the transaction in question.  While there was a clear understanding on the part of the libelant that the repairs were furnished on the credit of the Ella, neither the claimant or Jardine, nor any other person connected with the transportation company, has in his testimony denied the existence of such an understanding on the part of that company.  In fact the testimony of both the claimant and Jardine shows that they had such an understanding.  The libelant, July 28, 1896, after pressing the transportation company for payment for the repairs, took a note from the latter to cover their price.  The claimant was asked:  "Did the acceptance of this note by the Neafie and Levy Ship and Engine Building Company relieve you from the supposition that they would make any claim for a lien upon the boat?" and he replied:  "I didn't know that they had any lien against the steamboat, because I thought they had taken the note and that was in settlement of their claim, and I didn't know whether the note had been paid or not."  The claimant impliedly admits that the libelant had a lien at sometime for the repairs, because he gives as the only reason why he did not know that there was a lien his supposition that it had taken the note in settlement of its claim. He nowhere states that the repairs were furnished without any understanding on his part or on that of the transportation company that there was to be a lien.  By fair implication he admits that the re-

pairs had been furnished on the credit of the Ella. Jardine wrote a letter to the libelant August 31, 1896, [Libelant's Exhibit 3,] in which he said:

"We want our steamer to run but parties here will not allow it fearing trouble from you and Reakirt & Bro. & Co., the only ones having any bills against the boat. * * * Will you not be kind enough to write me a letter so I can show to bank, in which you agree not to attach or interfere with in any way the steamer 'Ella' before Jany. 1, 1897."

This letter was written after the execution, August 21, 1896, of the bill of sale of the Ella by the transportation company to the claimant, which Jardine testifies was an absolute bill of sale. In view of this fact, Jardine, in stating that there were bills against the Ella upon which she might be taken, necessarily recognized that the libelant had a lien on the vessel good as against any title acquired by the claimant under the bill of sale; for his understanding, as shown by the letter, was that, by reason of the transfer to the claimant, no general creditors had the right to attach the Ella as the property of the transportation company. While it is true that a lien will not be created by mere recognition after the furnishing of the repairs for which it is claimed, such recognition is potent evidence that the repairs were furnished on the credit of the vessel. Certainly Jardine had an understanding to that effect when he wrote the letter. If he had it then, when did he first acquire it? The transportation company through Jardine wrote again to the libelant September 14, 1896, [Libelant's Exhibit 4,] saying:

"In reference to my conversation with you in regard to steamer 'Ella,' Mr. Hoffecker is perfectly willing for me to have the use of the boat but does not want her stopped in Philadelphia. * * * We do not wish you to do anything to release your lien on the boat and only ask that you stay proceedings and allow the boat to run for the balance of this year or until your note becomes due."

The libelant, through Neafie, wrote, [Libelant's Exhibit 5,] in reply to this letter on the following day, saying:

"If we agree to your request, what security have we that our claim will be paid when demanded, and what security have we that the steamer will not be further jeopardized by expenses incurred in running the boat, such as wages, wharfage, repairs and etc.; and what further guarantee can you give us, that if we postpone our demand, that our lien upon the boat shall not be in any manner whatever, jeopardized; or what security have we that other creditors may not come in and make a foreign attachment for ordinary debts against the company, and also that the present status of our lien shall be in nowise affected?"

Jardine replied to this letter, [Libelant's Exhibit 6,] on the next day, saying:

"You seem to get the matter wrong. The steamer Ella belongs to Jno. H. Hoffecker and is subject to no attachment for debts of this company other than yours and Reakirt, Bro. & Co. Mr. Hoffecker is willing to charter Ella to us to run provided you will not attach her in Phila. as your lien and that of Reakirt's are the only ones against the boat. * * * You do not release yr. claim in any way but only stay proceedings, so we can have the use of the steamer 'Ella.' "

This correspondence shows two things: first, an unqualified recognition of a lien on the Ella for the repairs in question, and, secondly, that the libelant was not informed until September 16,

1896, of the execution of the bill of sale to the claimant, August 21, preceding. The letter of the libelant to the transportation company of September 15, 1896, bears no mark of disingenuousness, but is such as one, conscious of having furnished the repairs on the credit of the Ella, naturally would have written under the circumstances. The correspondence on the part of Jardine was such as one, conscious of the existence of a lien for repairs, would have written. The parties thus having a clear understanding at the time of this correspondence that there was a lien on the Ella, it must be assumed, unless satisfactorily shown to the contrary, that the repairs were furnished on the basis of a lien by the common or mutual understanding of the parties at the time. No satisfactory evidence to the contrary is found in the case. It is true F. Albert Von Boyneburgk, a witness for the libelant, states, that at a meeting of the creditors of the transportation company, held in Philadelphia, September 11, 1896, he and Seddinger were present and that "we claimed that our claims were preferred claims on account of their being on the boat solely. As regards this matter Jardine was not thoroughly posted but he concluded that we were right in our interpretations." This circumstance, for several reasons, is insufficient to overcome the evidence showing a common understanding for a lien. It may be that at a meeting of the general creditors of the transportation company, called and held for the purpose of effecting some arrangement for the continuance of its business, Jardine was disinclined promptly and publicly to acquiesce in the assertion of liens against the Ella to the prejudice of the unsecured creditors; but there can be no doubt that Jardine at that time understood that the libelant was entitled to a lien, for, while the circumstance testified to by Van Boyneburgk occurred September 11, the first letter of Jardine to the libelant clearly recognizing the existence of a lien was written August 31, preceding. There is absolutely nothing in Jardine's testimony which negatives the existence of an understanding on the part of the transportation company that the repairs were to be and were furnished on the credit of the Ella. While he was examined as to the letters of September 14 and 16, 1896, he was not examined as to the letter of August 31, 1896. With respect to the letter of September 16 he was asked: "Did you undertake to give as your opinion that there was a technical lien, that these gentlemen had under the admiralty law, a lien upon that boat." He answered: "I don't propose to know anything about admiralty law, but only from the facts as stated that they had this lien against this boat, and if she went to Philadelphia they could attach the boat." He was then asked: "Then when you speak of them having a lien, did you or not take it from what they had said to you?" to which he replied: "I can't say that I did, it was just an opinion formed in regard to transactions we have had with them." He was then asked: "What transactions do you mean?" and answered, "They claimed that the coal, the repairs were a lien against the boat." He further states that it was by reason of the claim that there was a lien upon the Ella for repairs he asserted what he did with respect to the lien.

He also, in reply to the question: "Then anything that you state about their having a lien was merely a repetition of their assertion that they had a lien?" answered: "Yes sir; what is claimed to be the custom of a lien." It will be observed that Jardine does not, in explaining the letter of September 16, state that his understanding as to the existence of a lien was based solely upon the letter of the libelant to the transportation company of September 15, 1896, but on the contrary states that it was "an opinion formed in regard to transactions we have had with them" in which it was claimed that "the repairs were a lien against the boat," and that the transactions referred to related to the claim of the libelant. He also refers in this connection to the assertion of "what is claimed to be the custom of a lien." . This testimony is perfectly consistent with an understanding on the part of Jardine, when the repairs in question were ordered, that they were to be furnished on the credit of the Ella. He was with Smith in the office of the libelant in May, 1895, at the time repairs involved in the spring overhauling for that year were discussed and ordered. Smith states that he always had repairs charged against the vessel. Further, Jardine was thoroughly familiar with the course of dealing and correspondence between the parties during prior years. He must have known the custom of the libelant to look to vessels as security for repairs furnished to them; for he speaks of an assertion by the libelant of "the custom of a lien." . Nothing was said in the correspondence, just referred to, about any such custom. There is no evidence in the case to show that at any time since May, 1895, and prior to the correspondence beginning August 31, 1896, anything was said or done to present to the mind of Jardine "the custom of a lien." The only reasonable deduction from the evidence is that Jardine prior to May, 1895, was familiar with the custom of the libelant to charge repairs to the vessel and look to her for payment, and that he as manager of the transportation company dealt with the libelant for the furnishing of the repairs in question on the basis of and in accordance with that custom.

There is one circumstance entitled to great weight upon the question of lien or no lien. The correspondence during August and September, 1896, shows a clear recognition by the transportation company of a lien for the repairs in question. In view of that correspondence the burden rested upon the claimant to negative the existence of an understanding on the part of the transportation company that the repairs were to be and were furnished on the credit of the Ella. Both the claimant and Jardine were witnesses and must have been sensible of the importance of showing, if such were the fact, that there was no such understanding. Yet neither of them, nor any other person, has testified that there was no such understanding, whether mutual or common, at the time the repairs were ordered or during the furnishing of them. Silence in such a case amounts to admission.

Jardine states that he had not been authorized by the transportation company either to create a lien for the repairs or to say

to the libelant that it had a lien therefor. But this is of no importance, as he had been appointed or was recognized by the transportation company as its general manager. No want of authority on his part could affect the rights of innocent third persons. As to them his acts and statements must be treated as those of the company he represented.

There are several circumstances disclosed in the evidence which the proctor for the claimant contended negatived the existence of a lien. Much stress was laid upon the facts that the transportation company had been dealing for many years with the libelant and Neafie & Levy; that there was a running account for repairs; that promissory notes of the transportation company had been received by the libelant on several occasions for the price of· repairs; that the transportation company had credit with certain business houses in Philadelphia and with certain banks elsewhere prior to and during the period in which the repairs in question were furnished; and that the libelant solicited business from the transportation company. But, taking the evidence as a whole, these circumstances are entitled to little, if any, weight. They are all consistent with the existence of a lien. That the dealings between the parties continued for many years does not tend to show that the libelant who was in utter ignorance of the financial standing of the transportation company intended to give exclusive credit for repairs to that company, while the Ella was making her regular trips and in reach of process in Philadelphia. If the libelant had at any time prior to May, 1895, brought suit in personam against the transportation company for the price of repairs furnished to the Ella, an inference might be drawn, but there is no evidence of any such suit. Nor is the fact that there was a running account between the companies of any significance under the circumstances of this case. It was not a mutual account, but simply an account charging the price of repairs furnished by libelant, on one side, and showing, on the other, payments by the transportation company for repairs. So, the acceptance of promissory notes of the transportation company is equally without significance; the evidence showing that such notes were not negotiated by libelant, were not considered payment unless paid, and were taken always with the understanding on the part of the libelant, at least, that a lien for repairs should not be affected thereby. Nor can the possession by the transportation company of credit in Philadelphia or elsewhere avail the claimant. The dealings in this case having been directly between the libelant and the owner of the Ella, the possession or non-possession by the transportation company of credit elsewhere is utterly immaterial, unless it furnishes the ground upon which the libelant might be considered as having given credit exclusively to the transportation company. But the libelant had no knowledge of the existence of such credit. With respect to the solicitation by the libelant of business from the transportation company, it is enough to say that it consisted only of such language, usual in business correspondence, as "soliciting your further favors," or like phrases, and has no perceptible

bearing upon the question whether repairs to a vessel are furnished on the exclusive credit of the owner or on the credit of the vessel as well as that of the owner. Nothing in the mode of keeping the accounts between the parties militates in any degree against the giving of credit to the Ella for the repairs.

The evidence, with proper inferences drawn from it, shows a common understanding on the part of the libelant and transportation company that these repairs were to be and were furnished on the credit of the Ella as well as her owner, and, further, that each of these companies was aware or had good reason to believe that the other possessed such an understanding, and dealt upon the basis of a lien. The evidence discloses, to use the language of the court in The Valencia, "circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred." There was, at least, an implied agreement for a lien. The prima facie presumption that, in direct dealings between the ship owner and the repairer in a foreign port, the credit of the owner is exclusively relied upon, has been rebutted. Consequently, a lien existed under the maritime law by reason of the furnishing of the repairs in question.

The transportation company, having been pressed by the libelant for payment for the repairs, gave to the libelant its promissory note, July 28, 1896, at four months, for $1145.78, the amount of the bill, including certain interest thereon. About the beginning of August, 1896, the transportation company failed financially. The note has never been negotiated by the libelant. During the taking of the testimony it was tendered to the claimant, as president of the transportation company, and to Jardine, as secretary and treasurer, and both the claimant and Jardine refused to accept its tendered surrender. Again, at the hearing, the libelant offered to surrender the note, but its offer was not accepted. The mere acceptance, by a person entitled to a maritime lien for repairs, of a promissory note of the owner of the ship repaired, does not defeat the lien. There is a presumption that the note is taken only as collateral security; and this presumption continues unless it affirmatively appears that the note was taken with an intention that it should extinguish the lien. In this case the evidence satisfactorily shows that the note was taken with an understanding that it should not affect the lien. The lien on the Ella having been created on account of the repairs and not having been waived or extinguished by the promissory note, can this lien be sustained as against the claimant?

The claimant avers in the answer that he "was the true and bona fide owner of the said steamboat 'Ella,' her boilers," etc., and it is urged that he, in taking title to the Ella by bill of sale August 21, 1896, was an innocent purchaser for value, and that there was such laches on the part of the libelant as to require a dismissal of the libel. The evidence, however, shows that the claimant was not an innocent purchaser for value, but took title to the vessel only as security, and had notice, actual or constructive, of the

existence of the lien. In August, 1896, before the bill of sale was executed, the transportation company was insolvent and the Ella had been seized by the sheriff of Philadelphia county in foreign attachment proceedings. The claimant testifies that the consideration for the transfer to him was made up of two items; first, $1000, which had previously been loaned by him to the transportation company, and, secondly, $2932.87, paid by him to the sheriff to secure the release of the vessel with an understanding that he should receive a bill of sale from that company. He states:

"The Sheriff in Philadelphia seized the boat for a claim of Percy Heilner & Co., and I was asked to go to Philadelphia to look into the situation of it, and when I found what was necessary to be paid * * * I said I would have nothing to do with it unless an arrangement could be made by calling a meeting and transfer the boat to me as security for what I was going to pay. * * * At the meeting they took into consideration that they [the transportation company] owed me besides that," etc.

The bill of sale having been executed as security both for the $1000 previously loaned and for the $2932.87, the claimant properly testified that there was no understanding for the re-transfer of the Ella to the company upon the repayment of the sum paid by him to the sheriff. Jardine testifies that the bill of sale "was given absolutely covering other considerations," which consisted of a sum exceeding $1000 owed by the transportation company to the claimant, and that it was not intended that the bill of sale should be security only for "the money paid out by Mr. Hoffecker." If by this statement Jardine meant that the transfer to the claimant, though absolute in form, was by way of security for the $1000 as well as for the advances to the sheriff, his statement agrees with the testimony of the claimant. But if Jardine meant that the transfer was absolute, and not by way of security only, he is discredited on this point not only by the correspondence but by the testimony of other witnesses. In the letter of September 16, 1896, [Libelant's Exhibit 6], to the libelant, he said: "As to insurance. As Mr. Hoffecker has about $3500 in the boat [the Ella] he prefers to carry the insurance himself for his protection." Seddinger testifies that at the meeting of creditors, held September 11, 1896, Jardine presented a statement of the assets and liabilities of the transportation company, and among the latter was the sum of $3000, which the claimant paid to secure the release of the vessel in Philadelphia, and, further, that Jardine then stated that the bill of sale was given to the claimant to hold as security for the payment of that sum. Von Boyneburgk testifies that at that meeting Jardine "said that that bill of sale was given for the money which was given as a loan and as soon as it was paid for then the boat would be clear of Mr. Hoffecker. The sum mentioned was three thousand dollars." The claimant bore a fiduciary relation to the transportation company of which he was president. It is in the highest degree improbable that he intended to purchase from the company for the sum of $3932.87 a vessel which subsequently brought at marshal's sale $6200. The evidence is against the existence of such an intention, but, if it were not, such equita-

ble principles as obtain in a court of admiralty would under the circumstances require the transfer to be treated merely as security for the repayment of money. Neither a bill of sale nor a mortgage of a vessel, given to secure an antecedent indebtedness, will confer upon the vendee or mortgagee the rights of a purchaser for value or affect the existence or enforcement of a maritime lien. The Alfred J. Murray, 60 Fed. 926; Id., 11 C. C. A. 177, 63 Fed. 270. Therefore, no reliance can be placed upon the transfer to the claimant in so far as it was based upon the $1000 loan. But money advanced in consideration of the execution of a bill of sale or mortgage of a vessel will constitute the vendee or mortgagee a purchaser for value, and if the money has been advanced without notice, actual or constructive, of the existence of a maritime lien, the vendee or mortgagee will, in proceedings to enforce such lien, be treated as an innocent purchaser for value. A maritime lien, however, is not in any case directly defeated by an innocent purchase for value. The effect of such a purchase is that proceedings for the enforcement of the lien must be instituted without unreasonable delay, and what is unreasonable delay must be tested by what constitutes a fair opportunity by the exercise of reasonable diligence to arrest the vessel. The Lyndhurst, 48 Fed. 839; The Bristol, 11 Fed. 156, 162; The Lauretta, 9 Fed. 622. But in this case in the eye of the law the claimant cannot be treated as clothed with the rights of an innocent purchaser for value. Before the bill of sale was executed he knew that the libelant had furnished repairs to the Ella, and, as president of the transportation company, he countersigned the note for $1145.78, understanding that it was given for these repairs. He erroneously supposed that the acceptance of the note discharged the lien or that the note had been or would be paid. He "did not keep any record of the note, whether the note was paid." He testifies: "There is no salary attached to the office [of president] and I could hardly be expected to go there and have supervision when there was a secretary and treasurer and manager." While he states, that, before taking the bill of sale, he had an attorney look into the matter of claims against the Ella. it nowhere appears that he made any inquiry of the libelant, or even asked Jardine whether the note had been paid. Where one claims title to a vessel under a bill of sale from a corporation, of which he was at the time president, he is, for the protection of innocent third persons, chargeable with knowledge of all material facts which would have been disclosed to him had he exercised the duties of his office with reasonable circumspection, and no mistake of law can avail him. The knowledge of Jardine was the knowledge of the transportation company, and should in fact have been the knowledge of the claimant. In view of these considerations, the claimant is not entitled, even with respect to the money paid by him to the sheriff, to the protection accorded to an innocent purchaser for value. Upon the point of laches both the equities and law of the case are with the libelant. It dealt fairly with the transportation company from beginning to end. It did not demand a note for the repairs. Seddinger states, and his testimony

is not contradicted, that the libelant did not ask for or expect to receive the note; that it asked for a settlement of its account; that it expected to receive cash; but that the transportation company sent a note, and the libelant accepted it for the accommodation of the former.    There can be no doubt, on the evidence, that the transportation company was insolvent when the note was given. Within a few days thereafter the Ella was in the hands of the sheriff.    Yet the libelant, in possession of a four months note which it did not demand, was left by the transportation company in utter ignorance of its condition until August 29, 1896, [Libelant's Exhibit 9,] and, by. the claimant, in like ignorance of the execution of the bill of sale, until the second or third week in September. The libelant was not informed that the claimant was the owner of the vessel until its receipt of the letter written by Jardine September 16.    The charge of laches does not come with good grace from the claimant, and cannot be sustained.    The libelant was under the circumstances justified in repudiating the note and in proceeding in rem.    The fact that the libel was filed before the note became due is one which, at most, could only affect the matter of costs.    The Pioneer, 53 Fed. 279; The Papa, 46 Fed. 576.    In this case it can have no such effect.    Jardine, testifying May 5, 1897, states that the transportation company then owned no property.    Five libels in rem for wharfage, wages and supplies, were filed against the Ella in September, 1896, before the libelant in this case proceeded.    It was not necessary that he should longer wait.

The claimant seeks to obtain $5124.46 from the registry of this court, although the total indebtedness of the transportation company to him amounted, on his own showing, only to $3932.87, including both money loaned and money paid to the sheriff, and notwithstanding the fact that the bill of the libelant is conceded to be just and reasonable.    The difference between these two items is $1191.59,—more than the principal sum demanded by the libelant.    There is no equity in this position.    It is not stated in the libel that the repairs were furnished to the Ella in a foreign port or port of a state other than that in which she was owned.    No exceptions to the libel were filed.    Leave is granted to the libelant to amend the libel in this particular (The Samuel Marshall, 49 Fed. 754, 757); and, upon the filing of such amendment and the deposit on or before December 20, 1897, of the note of July 28, 1896, with the clerk to remain subject to the order of this court, a decree will be made in favor of the libelant for the amount of its demand with interest from May 30, 1896.