### THE ELLA.

### REAKIRT v. THE ELLA.

#### (District Court, D. Delaware. April 9, 1898.)

#### No. 554.

1. MARITIME LIENS—MARITIME CONTRACTS.

A sale of coal, pursuant to which the coal is delivered to a vessel to be carried as cargo under bills of lading to the purchaser as consignee, the vendor having knowledge that the purchaser is engaged in the business of selling such coal for other than maritime purposes, is not a maritime contract; nor do the facts that the consignee owns such vessel and that a portion of such coal, after having been delivered to the consignee, is supplied by it to such vessel as necessary fuel, serve to create or support a maritime lien.

2. SAME.

The question whether a maritime lien attached for the price of the coal must be determined on the facts and circumstances as they existed at the time of its original delivery to the vessel, and cannot be affected by any subsequent application of the coal by the purchaser.

(Syllabus by the Court.)

Levi C. Bird and A. E. Sanborn, for libelant.
Lewis C. Vandegrift, for claimant.

BRADFORD, District Judge. This is a libel in rem filed September 30, 1896, by Margaret L. Reakirt, of the City of Philadelphia, Pa., trading as Reakirt Brother & Company, against the steamboat Ella, to recover the price of coal furnished in that city by the libelant on the credit of that vessel, as is alleged, from April 14, 1896, to August 22, 1896, inclusive, amounting, after deducting certain allowances, to $707.22, together with interest thereon from the last mentioned date. The Ella was owned solely by The Philadelphia and Smyrna Trans-

portation Company, a corporation of Delaware, from 1889 at least until August 21, 1896, on which day that company executed a bill of sale to John H. Hoffecker, the claimant. The claimant asserts that from that time he was the sole owner of the vessel until she was sold, October 19, 1896, by order of this court for the enforcement of a wharfage lien. The proceeds of sale remaining in the registry of the court, after deducting all other demands, are sufficient to cover whatever claim the libelant may have under this libel, together with the costs of suit. By agreement of the proctors for the libelant and claimant respectively, all the testimony in the case of Building Co. v. The Ella (recently decided by this court) 84 Fed. 471, is to be considered, so far as material, in this case. The price charged for the coal furnished by the libelant is reasonable, and Philadelphia was a port foreign to the Ella in the sense of being a port in a state other than that in which she was owned during the furnishing of the coal. At the time of and for many years prior to the transaction in question the libelant carried on business in Philadelphia as a coal dealer, and F. Albert von Boyneburgk was the general manager of her business. The transportation company was incorporated under the laws of Delaware in 1883 for the purpose of transporting freight by vessel between the town of Smyrna, Del., and Philadelphia, Pa., and elsewhere. For the last six or seven years the claimant has been and now is its president. Pursuant to its charter the transportation company engaged in the carriage of freight by vessel to and from Smyrna and Philadelphia, regular trips being made over the route several times a week. Augustus E. Jardine has been the general manager of the transportation company for many years. That company has for the past eight or ten years dealt, although not exclusively, with the libelant in purchasing coal. The correspondence between the libelant and the transportation company shows beyond doubt that during all that time the furnishing of coal by the former to the latter was the result of direct dealings between them. In addition to the business of transportation, the transportation company was engaged in selling a considerable proportion of the coal bought by it from the libelant and others, to blacksmiths and other persons in or near Smyrna. Von Boyneburgk testified, without qualification, that all coal delivered by the libelant to the Ella was furnished upon the credit of that vessel and was charged invariably to "Stmr. Ella and Owners." The fact that such a charge was made, standing alone, is entitled to but little weight and is wholly inconclusive on the question whether credit was given to the vessel as well as to her owner. Nor could a mere belief on the part of the libelant or of von Boyneburgk that the furnishing of the coal would create a lien on the Ella avail the libelant unless the circumstances under which the coal was furnished were such as to justify such belief. The testimony for the libelant strongly tends to support a lien for the whole amount demanded in the libel, but that testimony is inconsistent with the documentary evidence, which is of primary importance in the case. The coal furnished by the libelant to the transportation company, including the coal in question, was, while that company continued to own the Ella, all delivered to that vessel; but the documentary evidence shows that while a comparatively small pro-

portion of the coal was supplied for the use of the Ella, the balance of it was delivered and received on board of that vessel as cargo to be transported to the transportation company at Smyrna, there to be disposed of in accordance with the pleasure of that company. Upon the delivery of coal by the libelant in Philadelphia, bills of lading were signed by the pilot of the Ella, acting for and representing her master, for all coal intended to be delivered as cargo at Smyrna, and bunker receipts were signed by the pilot in the same capacity for such coal as was supplied for the use of the vessel. The bills of lading were substantially in the following form:

"Shipped by Reakirt, Bro. & Co., in good order, on board the Stmr. called the Ella of ——— whereof ——— is Master for this present voyage, and now lying in the Port of Philadelphia, and bound for Smyrna, Del., 28 tons of coal, which I promise to deliver at the aforesaid Port of Smyrna in like good order, (the dangers of the seas only excepted,) unto Phila. & Smyrna Trans. Co. or their assigns, he or they paying freight for the same at the rate of ——— Dollars per ton.

"And 24 hours after the arrival at the above named port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted, for every hundred tons thereof, after which the cargo, consignee or assignee shall pay demurrage at the rate of eight cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo, as per this bill of Lading. For each and every day's detention, and pro rata for parts and portions of a day beyond the days above specified, until the cargo is fully discharged; which freight and demurrage shall constitute a lien upon said cargo.

"In Witness Whereof, the Master or Purser of the said Vessel has affirmed to 3 Bills of Lading, all of this tenor and date; one of which being accomplished the others to stand void.

"Dated at Philadelphia, this 14 day of April, 1896.

"28 Tons in the Hold.

"———" on Deck.

"Draws ——— feet water, and was built at ——— in 189 .

"J. L. Jackson."

The bunker receipts were in the following form:

"No. 18619.        Penna. R. R. Pier.  Greenwich.      5/29      1896.

"Shipped for account of Reakirt, Bro. & Co., Office 218½ Walnut Street, on board Steamer Ella, 5 tons of Penn coal, for steamers' use. I certify that I have received on board, in good order, the quantity and kind of coal above specified.                    J. L. Jackson, Master."

The bills of lading and bunker receipts were signed in the office of the libelant on her pier at Greenwich. Both the libelant or her manager, von Boyneburgk, and the transportation company had knowledge of the execution of bills of lading and bunker receipts for a number of years preceding the furnishing of the coal in question. Not only bunker receipts but bills of lading were executed in connection with the supply of coal included in the present demand. A sale by the libelant to the transportation company of a cargo of coal not to be used in aid of navigation was not a maritime contract, and could give rise to no lien nor serve as the basis of any lien cognizable by this court. It appears that the coal bought by the transportation company from the libelant and others was placed on the wharf of that company at Smyrna, and that the bunkers of the Ella, while sometimes supplied with coal directly by the libelant, bunker receipts being taken therefor, were usually supplied from the accumulation of coal

on the wharf at Smyrna. It was urged on behalf of the libelant that the supplying at Smyrna by the transportation company of the bunkers with coal had the same effect, under the circumstances disclosed in the case, as if they had been supplied with coal by the libelant in Philadelphia. I regard this position as untenable. No element of fraud on the part of the transportation company is disclosed in this connection. The question whether or not a maritime lien arose must be determined on the facts as they existed at the time the coal was delivered by the libelant to the Ella in Philadelphia. No subsequent application of the coal by the transportation company in Smyrna could create a lien in favor of the libelant. It is also to be noticed, in passing, that it does not appear that the coal belonging to the transportation company and situate on its wharf was all obtained from the libelant. Considered in any aspect warranted by the evidence, the fact that a portion of the coal sold by the libelant to the transportation company as cargoes of merchandise was subsequently applied by that company to aid the navigation of the Ella could not give rise to a maritime lien. I am satisfied that the libel cannot be sustained for the price of the coal for which bills of lading were signed. For the coal, however, which was furnished by the libelant in Philadelphia to the bunkers of the Ella for her use, I am of opinion, in view of all the evidence, that the libelant is entitled to a lien. The correspondence between the libelant and the transportation company, fairly considered, shows that that portion of the coal was furnished on a common understanding that a lien should thereby be acquired. Although the dealings, as shown by that correspondence, were directly between the libelant and the transportation company, the common understanding that the coal was to be furnished on the credit of the vessel, as well as on that of her owner, was sufficient to rebut the presumption of the non existence of a maritime lien. The evidence negatives the allegation that the claimant became, by virtue of the bill of sale of August 21, 1896, or in any other manner, a bona fide purchaser for value of the Ella. It is unnecessary to recapitulate the facts bearing on this point. It is not stated in the libel that the coal was furnished to the Ella in a foreign port or port of a state other than that in which she was owned at the time. No exceptions to the libel were filed; and leave is granted to the libelant to amend the libel in this particular. It appears that the bills of lading, and bunker receipts, if any, for coal furnished by the libelant to the transportation company during a part of June and the months of July and August, 1896, are lost or mislaid; and no evidence has been adduced to prove the amount of coal furnished during that period for the use of the Ella. Upon filing the amendment to the libel above suggested on or before April 23, 1898, an order of reference will be made to a commissioner to report to this court the amount due and owing from the transportation company to the libelant for such portion of the coal included in the schedule annexed to the libel as was furnished by the libelant in Philadelphia to the Ella for her use.